# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-1491

_____

Lucas A. Canny,                   *

                           *

         Appellee,        *

                           *   Appeal from the United States

   v.                    *   District Court for the

                           *   Southern District of Iowa.

Dr. Pepper/Seven-Up Bottling  *

Group, Inc.,              *

                           *

         Appellant.       *

_____

Submitted: November 16, 2005
Filed: March 9, 2006

_____

Before ARNOLD, BEAM, and RILEY, Circuit Judges.

_____

RILEY, Circuit Judge.

Lucas Canny (Canny) brought this action against his former employer, Dr. Pepper/Seven-Up Bottling Group, Inc. (Dr Pepper),[1] claiming violations of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213, and the Iowa Civil Rights Act (ICRA), Iowa Code Chapter 216. The case proceeded to trial, and a jury found for Canny, awarding him compensatory and punitive damages. For the reasons set forth below, we affirm the jury's liability finding and compensatory damages award, but reverse the punitive damages award.

_____

[1]The period after Dr was dropped in the 1950s.

## I.    BACKGROUND

In October 1998, Canny began working as a route driver in the sales department of Mid-Continent Bottlers, Inc. (Mid-Continent) in Ottumwa, Iowa. Shortly thereafter, Dr Pepper acquired Mid-Continent.[2] As a route driver, Canny drove a semi-truck, and accordingly, Dr Pepper required Canny to maintain an unrestricted driver's license. In July 1999, Dr Pepper promoted Canny to account manager. Canny had 100 to 150 accounts and had to drive to the various customer locations to maintain those accounts. In November 2001, Dr Pepper promoted Canny to route supervisor and put him in charge of several route drivers and account managers. As route supervisor, Canny's responsibilities included driving routes and making deliveries when his route drivers were unavailable.

On March 11, 2002, Canny was diagnosed with Stargardt's Disease, a hereditary degenerative eye disease that causes loss of central vision but does not affect peripheral vision. Canny had a visual acuity of 20/200, rendering him legally blind and unable to qualify for a driver's license. The doctor told Canny his visual acuity would probably not become any worse, but it could not be treated or corrected.

On March 12, 2002, Canny told his supervisor, Doug Canny (Doug) (no relation), and vending manager, Tim O'Neill (O'Neill), about his diagnosis, and that he no longer qualified for a driver's license. The three men discussed the possibility of Canny continuing in his position as route supervisor by riding with a vending manager on the occasions he needed to fill in for his route drivers. They also talked about transferring Canny to another position in the sales department, in the production facility, or in the warehouse. Canny told them, "I would transfer anywhere to do about anything at any time. I just really wanted–I was just worried sick. I wanted to

---

[2]In May 1999, Dr Pepper opened a larger facility which housed the sales and distribution operation, as well as the production warehouse. Dr Pepper employed approximately 200 people at the larger facility.

stay." Doug said he had no authority to create a new position for Canny because of Dr Pepper's hiring freeze and they should talk to Brenda Dixson (Dixson), Dr Pepper's Regional Human Resources Manager. Doug and Canny told Dixson about Canny's visual impairment and some of the accommodations they had discussed. Dixson told them that those options "would require a change in head count," and "there is no way they could do it." Canny then suggested transferring to a position in the production unit or in the warehouse. According to Canny, Dixson dismissed the suggestion saying, "There's just no way we can put you out there. You'll either kill someone or you'll lose an arm." Dixson ended the meeting after about five minutes saying she would file Canny's medical leave of absence paperwork. Dr Pepper placed Canny on medical leave effective March 12, 2002.

Canny continued to contact Doug about available positions. Doug discussed the situation with Dr Pepper's division manager, Randall Hall (Hall). Hall told Doug not to have any further contact with Canny "[b]ecause we didn't have anything open in Ottumwa" and "to refer any questions that [Canny] had to [Dixson], because it was past me." Dixson never contacted Canny about any available positions.

Brenda Criswell (Criswell), a rehabilitation counselor from the Iowa Department for the Blind (IDB), met with Canny shortly after his diagnosis. At Canny's request, Criswell stopped by Dr Pepper's Ottumwa facility to see Dixson. Dixson was unavailable. Criswell thereafter left several telephone messages for Dixson; Dixson never responded. On March 25, 2002, IDB's president sent a letter to Hall, with a copy to Dr Pepper's CEO, inquiring about possible accommodations for Canny. Hall forwarded the letter to Dixson who responded that driving was an essential function of all positions at the Ottumwa facility.

While on medical leave, Canny received disability insurance payments along with social security disability benefits. From June 2002 to October 2002, Canny worked part time as a forklift operator for Schwartz Beer Wholesalers, Inc.

(Schwartz). In March 2003, Canny worked full time for Mahaska Bottling Company (Mahaska) until its busy season ended in November 2003. Although Canny expected Mahaska to rehire him, Mahaska did not. In May 2004, Canny went back to work for Schwartz two days a week earning $80 per day. After leaving Dr Pepper, Canny got married, he and his wife had a child, and his wife began attending school in Ottumwa making it impossible for Canny to leave Ottumwa for work.

On April 3, 2003, Canny filed a lawsuit alleging Dr Pepper discriminated against him and failed to accommodate him in violation of the ADA and the ICRA. Canny requested compensatory damages, lost wages and benefits, and punitive damages. Dr Pepper moved for summary judgment, which the district court denied on July 21, 2004, finding genuine issues of fact existed regarding whether reassignment to a vacant position was a reasonable accommodation and whether Dr Pepper made a good faith effort to engage in the interactive process of seeking reasonable accommodations. In response to the district court's ruling, Dr Pepper sent a letter on July 30, 2004, offering Canny a merchandiser position at Dr Pepper's Des Moines facility (July 30 offer). Dr Pepper conditioned the offer on Canny finding his own transportation to job sites, as well as a physician's confirmation Canny could safely operate forklifts and motorized pallet jacks. Dr Pepper had not previously notified Canny of any job vacancies at any of Dr Pepper's other facilities. Canny declined the position because of his family circumstances.

The case proceeded to trial on Canny's failure to accommodate claim and resulted in a verdict for Canny. The jury awarded $53,910 in back pay, $20,000 in past emotional damages, and $100,000 in punitive damages. Dr Pepper renewed its motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), arguing insufficient evidence supported the jury's verdict and the punitive damages award. In the alternative, Dr Pepper moved for a new trial, arguing the district court erred by admitting the July 30 offer into evidence and by submitting certain jury instructions. Dr Pepper also moved for remittitur of the back pay award.

Canny moved for the award of front pay, attorney fees, and expenses. The district court granted Canny's motion for attorney fees and expenses, but denied all other motions. On appeal, Dr Pepper renews all issues raised in its post-trial motions with the exception of the jury instruction challenge.

## II. DISCUSSION
### A. Judgment as a Matter of Law

We review de novo the denial of a motion for judgment as a matter of law, applying the same standard as the district court. Ostrander v. Duggan, 341 F.3d 745, 748 (8th Cir. 2003). A judgment as a matter of law is appropriate if "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1). We grant Canny all reasonable inferences and view the facts in the light most favorable to Canny. See Webner v. Titan Distrib., Inc., 267 F.3d 828, 833 (8th Cir. 2001). We have long held that "where conflicting inferences reasonably can be drawn from evidence, it is the function of the jury to determine what inference shall be drawn." Ryther v. KARE 11, 108 F.3d 832, 845 (8th Cir. 1997) (en banc) (internal quotations omitted). We are "reluctant to set aside a jury's verdict and will not do so lightly." Kelly v. Armstrong, 206 F.3d 794, 797 (8th Cir. 2000).

In his complaint, Canny alleged claims of disparate treatment and failure to accommodate under the ADA and the ICRA. However, on appeal, Dr Pepper only raises issues relating to Canny's failure to accommodate claim. On claims for failure to make reasonable accommodation under the ADA, we apply a modified burden-shifting analysis. Fenney v. Dakota, Minn. & E. R.R. Co., 327 F.3d 707, 712 (8th Cir. 2003).[3] "Thus, [Canny] must first make a facial showing that he has an ADA

---

[3]"Disability claims under the ICRA are analyzed in accordance with federal standards." Brunko v. Mercy Hosp., 260 F.3d 939, 941 (8th Cir. 2001). The parties do not contest the district court's parallel treatment of the claims.

disability and that he has suffered adverse employment action. Then he must make a facial showing that he is a 'qualified individual.'" Id.

The ADA defines a disability as "a physical or mental impairment that substantially limits one or more of the major life activities," 42 U.S.C. § 12102(2)(A), and defines a qualified individual as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires," id. § 12111(8). Canny's visual impairment is a disability within the meaning of the ADA because it substantially limits Canny's major life activity of seeing. Canny suffered adverse employment action when he lost his job due to his vision disability. Dr Pepper, however, contends Canny failed to prove by sufficient evidence he was a qualified individual under the ADA.

### 1. Qualified Individual

Analyzing whether a person is a qualified individual is a two-step process: first, we determine whether the individual possesses the requisite skills for the job; second, we must determine whether the individual can perform the essential functions of the job, with or without reasonable accommodation. Moritz v. Frontier Airlines, Inc., 147 F.3d 784, 786-87 (8th Cir. 1998). "An essential function 'means the fundamental job duties of the employment position the individual with a disability holds or desires. The term "essential functions" does not include the marginal functions of the position.'" Id. at 787 (quoting 29 C.F.R. § 1630.2(n)(1)). Evidence a function is essential includes the employer's judgment as to which functions are essential, a written job description, and the amount of time spent on the job performing the function. 29 C.F.R. § 1630.2(n)(3).

Dr Pepper concedes Canny possessed the requisite skills for the merchandiser and warehouse loader positions, but argues the evidence was insufficient to show Canny could perform the essential functions of either position and, therefore, Canny

failed to prove he was a qualified individual under the ADA. Dr Pepper also argues Canny did not prove by sufficient evidence Dr Pepper failed to engage in the interactive process. Canny submits Dr Pepper waived the sufficiency of the evidence argument regarding the warehouse loader position by omitting the issue in its pre-verdict Rule 50(a) motion for judgment as a matter of law. Alternatively, Canny asserts the evidence produced at trial was sufficient to show he could perform the essential functions of either position. Canny denies he had the burden of showing Dr Pepper failed to engage in the interactive process, but argues nonetheless ample evidence supports that conclusion.

### a.    Warehouse Loader Position
#### (i)    Waiver

"Rule 50(a) requires that challenges to the sufficiency of the evidence must be raised initially at the close of the evidence. Such challenges must be sufficiently specific so as to apprise the district court of the grounds relied on in support of the motion." Conseco Fin. Servicing Corp. v. N. Am. Mortgage Co., 381 F.3d 811, 821 (8th Cir. 2004) (citing Fed. R. Civ. P. 50(a)(2)). Articulation of the grounds for judgment as a matter of law affords the nonmoving party the opportunity to cure the defects which may preclude the jury from considering his case. Id. Stating the grounds of the motion with technical precision is not required, as long as the trial court is made aware of the movant's position. Id. "A post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion." Fed. R. Civ. P. 50(b) advisory comm. notes to 1991 amendment. "Adherence to the rule is mandatory." Conesco, 381 F.3d at 821.

At the close of Canny's case-in-chief, Dr Pepper moved for judgment as a matter of law pursuant to Rule 50(a) stating:

> With respect to the warehouse loader, I'll have to say that there is a dispute, so I don't know that the Court grant the directed verdict motion with respect to the–solely the issue of warehouse loader.

. . . .

> For those reasons we would ask that the Court direct a verdict in favor of Defendant and against Plaintiff on all positions except the warehouse loader position and that the Court direct a verdict on that position based on the good faith defense.

We find Dr Pepper unambiguously excluded the warehouse loader position from its Rule 50(a) motion, and therefore waived the issue in its Rule 50(b) motion.

### (ii)     Essential Functions

The waiver notwithstanding, ample evidence supports the jury finding Canny could perform the essential functions of the warehouse loader position. Dr Pepper disputed Canny's ability to operate a forklift. Canny testified he maintained a forklift license, operated a forklift without any problems while he worked for Dr Pepper, and continued to do so at other jobs after leaving Dr Pepper. Doug testified Canny drove a forklift safely without incident and he had no reason to believe Canny could not continue doing so. O'Neill also testified he saw Canny safely operate a forklift. Canny testified Dr Pepper never asked him about his vision limitations or whether he was able to operate a forklift. Doug similarly testified forklift certification did not require a vision examination. Dixson testified she never asked Canny for medical verification of his ability to drive a forklift, but simply concluded "if you ha[ve] been restricted in operating a motor vehicle, I don't believe you would be able to operate a forklift." Dixson conceded Dr Pepper had no minimum vision acuity requirement for driving a forklift, but said "Mr. Canny's 20/200 legal blind vision was the entire issue to be considered." Dixson testified there were warehouse loader positions available between March 2002 and July 2002, but she did not offer them to Canny. Even if Dr Pepper had not waived the issue, this evidence is sufficient for a reasonable jury to conclude Canny could perform the essential functions of a warehouse loader position.

### b.     Merchandiser Position

Dr Pepper argues the employer determines the essential functions of a job, and the merchandiser position requires the ability to drive. Canny argues Dr Pepper's July 30 offer demonstrates driving was not an essential function. We agree with Canny.

Although the ADA does not require an employer to reallocate the essential functions of a job, restructuring marginal job functions is a reasonable accommodation. Benson v. Northwest Airlines, Inc., 62 F.3d 1108, 1112 (8th Cir. 1995). Canny testified merchandisers used pallet jacks and walk-behind forklifts, but did not drive trucks or operate motorized equipment. Dixson testified merchandisers usually drove between customer locations and Dr Pepper always considered driving an essential function of a merchandiser position. Dr Pepper paid merchandisers for their travel time between customer locations. Dixson conceded Dr Pepper's July 30 offer demonstrated Canny could have arranged his own transportation between customer locations. Dixson also admitted there were open merchandiser positions in Iowa after March 12, 2002, and before Dr Pepper offered Canny the position on July 30, 2004. This testimony provided sufficient evidence for the jury to conclude Canny could perform the essential functions of available merchandiser positions.

### c.     Interactive Process

Dr Pepper asserts Canny did not prove by sufficient evidence Dr Pepper failed to participate in the interactive process to determine reasonable accommodations. Under the ADA, an employer must engage in an interactive process to identify potential accommodations that could overcome the employee's limitations. Burchett v. Target Corp., 340 F.3d 510, 517 (8th Cir. 2003). "'[T]he failure of an employer to engage in an interactive process to determine whether reasonable accommodations are possible is prima facie evidence that the employer may be acting in bad faith.'" Cravens v. Blue Cross & Blue Shield of Kansas City, 214 F.3d 1011, 1021 (8th Cir. 2000) (quoting Fjellestad v. Pizza Hut of Am., Inc., 188 F.3d 944, 952 (8th Cir. 1999)). To establish Dr Pepper failed to engage in an interactive process, Canny must

show (1) he was disabled, (2) he requested accommodations, (3) Dr Pepper did not assist him in seeking accommodations, and (4) he could have been reasonably accommodated but for Dr Pepper's lack of good faith. See Cravens, 214 F.3d at 1021 (citing Fjellestad, 188 F.3d at 952).

Applying this analysis in the present case, Canny presented a submissible case for the jury. First, there is no question Canny is disabled and requested accommodations. Second, although Dr Pepper argues Canny's discussions with Doug and O'Neill, as well as Doug's multiple efforts to assist Canny are evidence of its good faith efforts, we disagree. Dr Pepper admitted Doug had no authority to offer Canny a position. Furthermore, Hall told Doug to discontinue discussing accommodations with Canny and to refer Canny's questions to Dixson. Third, Dixson and Hall both testified that after March 2002, they did not contact Canny regarding available positions or possible job accommodations. Dixson also admitted (1) she never investigated Canny's abilities which was "a step that [Dr Pepper] could have taken to avoid some of what we're going through here today," (2) she never sent Canny for a physician's evaluation because "we did not feel that it was necessary to do more," (3) she never contacted the production manager at the Ottumwa facility about available positions for Canny, (4) she knew of Canny's willingness to go to any Dr Pepper facility to stay employed with Dr Pepper, and (5) nothing prevented Dr Pepper from making the July 30 offer two years earlier. Dr Pepper's perception that the accommodations Canny suggested were impractical did not relieve Dr Pepper of its obligation to discuss possible accommodations that were available and appropriate. Fjellestad, 188 F.3d at 953.

## 2. Punitive Damages

"'Federal law imposes a formidable burden on plaintiffs who seek punitive damages' in employment discrimination cases." Webner v. Titan Distrib., Inc., 267 F.3d 828, 837 (8th Cir. 2001) (quoting Henderson v. Simmons Foods, Inc., 217 F.3d 612, 618 (8th Cir. 2000)). Although punitive damages are available in ADA cases,

they are limited "to cases in which the employer has engaged in intentional discrimination and has done so 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 529-30 (1999) (quoting 42 U.S.C. § 1981a(b)(1)); Webner, 267 F.3d at 837. "The terms 'malice' and 'reckless' ultimately focus on the actor's state of mind," and "'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." Kolstad, 527 U.S. at 535 (discussing punitive damages under Title VII). To sustain an award of punitive damages, the employee must often show something more than intentional discrimination. Id. at 536. An award of punitive damages is inappropriate, for example, when "the underlying theory of discrimination may be novel or poorly recognized," or when the employer (1) is unaware federal law prohibits the relevant conduct, (2) believes the discriminatory behavior is lawful, or (3) reasonably believes there is a bona fide occupational qualification defense for the discriminatory conduct. Kolstad, 527 U.S. at 536-37; Webner, 267 F.3d at 837.

Dr Pepper argues insufficient evidence supports the punitive damages award because evidence of malice or reckless disregard is lacking. We agree. Although we concluded sufficient evidence supports the jury's finding Dr Pepper intentionally and unlawfully discriminated against Canny by failing to accommodate him, Dr Pepper's conduct did not, as a matter of law, rise to the level of malice or reckless indifference.

Dr Pepper did not offer Canny reassignment to an available position in the warehouse because Dr Pepper believed Canny's poor vision created a safety risk to Canny and to others. Dixson based that safety concern on a serious arm injury sustained by another employee in the warehouse just six months earlier. Dixson also testified she had "very, very serious concerns about [Canny's] safety if he was operating . . . a forklift." Dixson said she logically equated Canny's inability to operate a motor vehicle, with an inability to operate motorized equipment in the plant. Dixson testified, "I believe that the basis of our decision to disallow [Canny] to drive

a forklift would be substantiated by an OSHA investigator or by [a] medical professional as putting [Canny] and the other employees at undue risk." Dr Pepper reasonably perceived itself caught between federal regulations under the Occupational Safety and Health Administration and federal law under the ADA, and made a culpable, but not malicious or reckless, decision based upon safety concerns.

Although these reasons are not enough to escape liability under the ADA, they do not constitute the type of malicious intent or reckless indifference required to support an award of punitive damages. See Webner, 267 F.3d at 837 (vacating a punitive damages award finding employer's safety concerns that employee would injure himself were consistent with the employer acting to protect itself, and, while culpable, did not rise to the level of malice required to sustain an award of punitive damages); see also Ollie v. Titan Tire Corp., 336 F.3d 680, 688-89 (8th Cir. 2003) (affirming the district court for vacating a punitive damages award where the employer's attempt to protect itself and its potential employee from repeated health problems and absences did not demonstrate malice or evil intent). Accordingly, the award of punitive damages must be set aside.[4]

## B.    New Trial

Dr Pepper next argues it is entitled to a new trial because the district court abused its discretion by admitting the July 30 offer into evidence. We review the district court's evidentiary rulings made at trial for an abuse of discretion. McPheeters v. Black & Veatch Corp., 427 F.3d 1095, 1103 (8th Cir. 2005).

---

[4]In his prayer for relief, Canny asked for punitive damages under both the ADA and ICRA. On appeal, however, the parties only address the standard for punitive damages under the ADA. Because the issue was not raised, we state no opinion regarding the standard or availability of punitive damages under Iowa law. United States v. Simmons, 964 F.2d 763, 777 (8th Cir. 1992) ("As a general rule, an appellate court may review only the issues specifically raised and argued in an appellant's brief.").

At trial, Canny moved to have Dr Pepper's July 30 offer admitted into evidence. Dr Pepper objected under Federal Rule of Evidence 403 arguing the letter was an offer of compromise and its admission constituted unfair prejudice. The district court ruled the letter was an admission by Dr Pepper, and could come into evidence. The district court sustained Dr Pepper's objection to the extent the letter itself would not be admitted into evidence because it appeared on counsel's letterhead, rather than on Dr Pepper's letterhead. However, the court ruled Canny would be allowed to cross-examine Dr Pepper's witnesses about the contents of the letter.

Despite this favorable ruling, Dr Pepper decided preemptively to introduce the contents of the July 30 offer during its direct examination of Dixson. Canny argues by making this preemptive move, Dr Pepper waived its challenge to the admission of the evidence on appeal. We agree. "Generally, a party introducing evidence cannot complain on appeal that the evidence was erroneously admitted." Ohler v. United States, 529 U.S. 753, 755 (2000). Dr Pepper cannot avoid the consequence of its own trial tactic by arguing it was forced to introduce the evidence during the direct examination of Dixson to diminish the prejudice. See id. at 758-59 (reasoning a defendant cannot make the decision to introduce damaging evidence (prior conviction) during her own testimony in order to remove its sting, "and still preserve its admission as a claim of error on appeal"). We conclude Dr Pepper waived a challenge to the admission of the July 30 offer.

### C.    Remittitur of Damages

The jury awarded Canny $53,910 in lost earnings. Dr Pepper moves for remittitur arguing Canny did not seek full-time employment from November 2003 through September 2004, and therefore he is not entitled to full-time wages or benefits. In response, Canny argues Dr Pepper did not object to the damages instruction and the jury correctly followed the instruction.

"A party harmed by discriminatory employment decisions has an affirmative duty to mitigate his damages by reasonably seeking and accepting other substantially equivalent employment."  Hartley v. Dillard's, Inc., 310 F.3d 1054, 1061 (8th Cir. 2002).  This duty did not require Canny to "go into another line of work, accept a demotion, or take a demeaning position."  Id.  Dr Pepper bears the burden of showing Canny failed to mitigate his damages.  See id.  We review for clear error the district court's finding of fact regarding Canny's reasonable effort to find other employment. See Kehoe v. Anheuser-Busch, Inc., 96 F.3d 1095, 1106 (8th Cir. 1996).

The district court instructed the jury that if it found Dr Pepper liable, then it must consider the amount Canny would have earned at Dr Pepper from March 12, 2002, to the date of its verdict, minus disability benefits, as well as wages and benefits from other employment.  The district court further instructed the jury that Canny had a duty to mitigate his damages, and if Dr Pepper proved by the greater weight of the evidence Canny failed to seek out or take advantage of an opportunity reasonably available to him, the jury must reduce Canny's damages "by the amount of the wages and fringe benefits he reasonably would have earned if he had sought out or taken advantage of such an opportunity."

The district court denied Dr Pepper's motion for remittitur holding the jury could have reasonably found Dr Pepper did not meet its burden of showing Canny failed to seek opportunities reasonably available to him.  The district court noted Canny sought full-time opportunities with Dr Pepper but was rebuffed; Canny found work in the Ottumwa area consistent with his experience and the seasonal nature of full-time work at a smaller bottling warehouse; and Canny's inability to find a full-time position with benefits did not mean he failed to take advantage of opportunities reasonably available to him.  The district court also remarked Dr Pepper's July 30 offer was not an unconditional offer of reinstatement, because the offer was conditioned on Canny arranging his own transportation, making wage concessions,

and relocating. The district court further reasoned Dr Pepper failed to engage in discussion with Canny regarding the accommodations of that position.

The district court thoroughly discussed the record evidence supporting the jury's compensatory award. Based on our review of the record, the district court did not clearly err in refusing to deduct from Canny's award the amounts claimed by Dr Pepper.

## III.   CONCLUSION

For the reasons stated, we reverse the district court's denial of Dr Pepper's motion for judgment as a matter of law as to the punitive damages award and affirm the judgment in all other respects. Accordingly, we remand to the district court for an entry of judgment consistent with this opinion.

_____