# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-3316

_____

Jeffrey Willnerd,                                    *
                                                     *
        Plaintiff-Appellant,                  *
                                                     *  Appeal from the United States
        v.                                    *  District Court for the
                                                     *  District of Nebraska.
First National Nebraska, Inc.,                       *
                                                     *
        Defendant-Appellee.                   *

_____

Submitted: March 26, 2008
Filed:  March 13, 2009

_____

Before RILEY, JOHN R. GIBSON, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Jeffrey Willnerd appeals the district court's adverse grant of summary judgment on his claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213.  Willnerd suffers from a voice condition that limits his ability to speak in a normal or controlled tone, periodically causes his voice to cut out completely, and requires him to put forth considerable exertion when speaking.  Defendant First National of Nebraska, Inc. ("First National"), a multi-branch bank located in Nebraska, terminated him from a loan officer/sales representative position that required substantial interaction with the public.  First National subsequently failed to rehire Willnerd after he applied for several positions through an internal rehiring program.

Willnerd argues these actions were adverse employment actions motived by discriminatory animus. First National asserts there was no discriminatory animus and characterizes Willnerd's termination as an economically motivated reduction in force. First National also characterizes the failure to rehire Willnerd as based on Willnerd's qualifications and the relative merits of different job applicants. Questions of material fact exist as to the veracity of First National's proffered reasons for terminating Willnerd, its reasons for not rehiring him through the internal rehiring program, and the ultimate question of discrimination. Because reasonable jurors could resolve these outstanding questions in Willnerd's favor and conclude he is entitled to relief on his claims, we reverse.

I.    Background

Willnerd began working at a bank in Beatrice, Nebraska in 1982. His initial duties "included a little bit of everything," but he was primarily responsible for real estate loans and some commercial and installment lending. In early 1983, First National, through a subsidiary, acquired the branch where Willnerd worked. Willnerd then worked for First National at the Beatrice branch for approximately twenty years until his termination in September 2003.

In his job as Loan Officer/Sales Representative, Willnerd solicited and prepared installment, consumer, and home-equity loan applications. He also sold credit cards and insurance products and underwrote credit. In addition, he served as the head of the branch's real estate department from about 1983 to 1993. According to Willnerd, he would occasionally close the bank and fill in for the branch president, Larry Keslar, when Keslar was absent. Starting in 1999, Willnerd also served as the branch's representative for Investment One, an investment firm affiliated with First National. Willnerd stopped his work for Investment One in 2001 because First National wanted

the Investment One position to be full-time, and he did not want to give up his banking duties.

In 1999 Willnerd began noticing a gradually worsening speech limitation. The ailment baffled his doctors. As noted above, Willnerd's voice would cut out and return, and it took considerable exertion for Willnerd to speak. By 2001, his voice was essentially limited to a whisper. Although Willnerd's position required substantial interaction with the public, he neither requested an accommodation nor sought a change of duties prior to his termination. Further, based on a comparison of numerical rankings he received during performance reviews over the years in question, and based on his loan productivity, his health condition did not adversely affect his job performance.[1]

Willnerd's coworkers were aware of his difficulty with speaking, and at least one coworker stated in a deposition that other coworkers had made fun of Willnerd's condition. Keslar remembered talking about Willnerd's voice with a supervisor from Omaha, Christopher Kisicki, during Kisicki's visits to Beatrice. Keslar also stated that he had spoken with Willnerd, Willnerd's coworkers, and bank customers about Willnerd's voice condition. Kisicki stated in his deposition that he was concerned about how customers might view Willnerd. Also, a higher-ranking supervisor from Omaha, David Ulferts, was aware of Willnerd's conspicuous condition because Ulferts met with Willnerd in Beatrice on at least two occasions after the onset of Willnerd's condition.

---

[1]The record contains numerical performance rankings for several categories spanning several years. First National discusses these figures at length in its brief. Taken in a light most favorable to Willnerd, however, these figures do not show that his performance deteriorated along with his voice, nor do they show that his performance was inferior to other employees at the Beatrice branch.

Willnerd's condition eluded diagnosis as of September 2003 when First National terminated him from his position. In November 2003, during a time when Willnerd continued to receive pay while seeking a different position with First National, physicians at the Mayo Clinic diagnosed Willnerd with the rare neurological voice disorder, hyperkinetic dysarthia. They prescribed a course of treatment that included Botox injections every three months. Later, the physicians altered their diagnosis, and in June 2004, Willnerd underwent surgery. These treatments ultimately failed to provide a substantial improvement in Willnerd's condition.

First National asserts that during the same general time frame as the onset and worsening of Willnerd's voice condition, 1999 to 2003, overall performance at the Beatrice branch was unacceptable. First National claims it recognized a need to increase income or reduce expenses at the Beatrice branch. In fact, it is undisputed that, prior to 2002, First National began a restructuring process in which it removed certain functions from several smaller branches and centralized these functions in Omaha. Underwriting functions were among those First National moved to Omaha. As such, some aspects of Willnerd's duties moved from Beatrice to a central office. Willnerd does not allege that the Beatrice branch was the only location from which First National removed functions. He also does not allege that this process comprised an adverse action or served as evidence of discriminatory intent.

In February 2002, Kisicki and Ulferts met with Keslar, Willnerd, and several other employees at the Beatrice branch: Jim Spangler, Assistant Branch Manager; Tamara Weers, Mortgage Loan Officer; and two personal bankers. First National describes the meeting generally as a pep-talk and strategy session to suggest ways to improve the cross-selling of services and to promote the generation of business through various methods, including increased referrals of existing customers for multiple lines of business. Ulferts and Kisicki stated in their depositions that concern about under- performance by the personal bankers was the primary impetus for the February 2002 meeting.

Notwithstanding First National's characterization of the meeting, it is undisputed that Willnerd alone received a specific production quota following the meeting. No other employees received such a quota, and Willnerd characterizes the quota as an impossible-to-meet goal established to guarantee his failure. Specifically, Ulferts, Kisicki, and Keslar told Willnerd to increase his overall annual volume of loans generated by one hundred percent, from $2 million to $4 million. Ulferts stated that it would have been impossible to achieve this goal solely through consumer loans or installment loans and that Willnerd would have needed to generate most of this increase through mortgage-related loans. From 2000 through 2005, however, total home-equity loan generation for the entire Beatrice branch ranged from $2.2 million to $3.2 million per year. Also, from about 2002 onward, the branch operated under a policy of having personnel refer home-equity borrowers to Weers, who served as the branch's mortgage specialist and reported directly to Omaha. As such, Willnerd's quota not only required him to double his annual generation, it required him to single-handedly outperform the entire branch's mortgage-lending volume at a level the branch ultimately failed to achieve at any time prior to or following his termination. Further, given the policy regarding Weers, First National expected Willnerd to achieve this quota without the assistance of referrals from other personnel.

In May 2002, First National changed Spangler's position from Assistant Branch Manager to a newly created position, Consumer Bank Sales Representative. Ulferts stated that for a branch the size of the Beatrice branch, with employees having a relatively long average tenure, the position of Assistant Manager was unnecessary. Ulferts also stated that, prior to the change, he was not sure what Spangler's job entailed and that he intended the move to allow Spangler to generate more business for the branch. In his new position, Spangler's written job description was identical to Willnerd's. Ulferts stated that after Spangler's reassignment, the primary function for Willnerd and Spangler was "to be out there trying to develop as much loan activity as possible." According to Spangler, after the reassignment, he "basically had the same title and responsibilities as . . . Willnerd." Spangler did have some additional

duties regarding the maintenance of deposit accounts, but Spangler stated this work was a small part of his job that he normally would perform when the personal bankers were busy. Spangler and Willnerd's base salaries were roughly equivalent. Following the change and through the time of Willnerd's termination, Spangler's loan production was inferior to Willnerd's. Also, Spangler's ratio of salary to loan production was less favorable than Willnerd's.

In May 2003, Ulferts and Keslar met with Willnerd and told Willnerd he had ninety days to increase production and improve his "overall proactive sales effort." Ulferts and Keslar did not meet with Spangler or the personal bankers or give them ultimatums regarding performance. Nevertheless, Ulferts and Keslar both stated after-the-fact that Spangler's performance was below expectations and unacceptable. In fact, when describing Spangler's performance, Keslar stated, "I didn't think he was putting forth the effort to go out and mak[e] calls, possibly taking advantage of all the opportunities of people in business or individuals when they came into the bank."

Following the May 2003 meeting, Willnerd's loan production increased, and Ulferts described Willnerd's performance as a "good effort." Willnerd, however, did not meet his production quota. On August 21, 2003, Ulferts issued a memo to his own superior, Thomas Haller, stating that he and Kisicki had decided to eliminate a position at the Beatrice branch. This memo did not make reference to Willnerd. At the end of September, Ulferts eliminated Willnerd's position.

In March 2004, seven months after the August 2003 memo, and six months after Willnerd's actual termination, Ulferts created a memo explaining the decision to terminate Willnerd. In the March 2004 memo, he wrote that a downturn in the Beatrice economy had made it necessary to eliminate a position. He also described the relative merits of Willnerd and other employees, suggesting that his decisionmaking process involved a comparison of branch personnel. Specifically, Ulferts's memo discussed the relative performance and expected future value of

Spangler, Willnerd, and the personal bankers. Ulferts concluded in the memo that Willnerd's position as Sales Representative was the most expendable. Later still, in deposition testimony, Ulferts stated that First National considered Spangler for termination. Kisicki, however, stated in deposition testimony that they were not looking at Spangler for termination because the decision to terminate Willnerd was based on Willnerd's performance. Ulfert's memo does not reference the fact that, based on a record of all personal bankers' performance within the entire First National system, the two personal bankers in the Beatrice branch were ranked last—eighty-sixth and eighty-seventh—out of a total of eighty-seven personal bankers.

Following Willnerd's termination, First National distributed his duties among Spangler, Weers, and Theresa Faxon. To a large extent, First National had transferred Faxon's duties to Omaha prior to Willnerd's termination. As such, prior to Willnerd's termination, Faxon had been completing her limited remaining duties each day in approximately two hours. She, nevertheless, remained a full-time employee. At the time of Willnerd's termination, Faxon was not experienced in sales, and she required a training period to assume the duties Willnerd previously held. At no time has Faxon achieved the level of sales Willnerd had achieved, and through 2005, the entire branch had not achieved the annual generation of home-equity loans demanded of Willnerd.

When terminated, Willnerd met with First National's Second Vice President of Human Resources, Mike Foutch. Foutch claims this meeting, in September 2003, was the first time he became aware of Willnerd's voice condition. Foutch explained First National's hiring program to Willnerd and told him he would continue to receive pay for sixty days while attempting to find a different position with First National. Later, in October 2003, Foutch referred Willnerd to Kristina Staebell, who more fully explained the hiring program to Willnerd and who was to serve as Willnerd's contact person throughout the job-search process. Staebell described the hiring program as a non-preferential system and stated that First National would consider Willnerd alongside external applicants and other internal applicants for any open positions.

Willnerd again met with Foutch on November 17, 2003, and, at that meeting, first discussed his medical condition with Foutch. Willnerd reported that he had been occupied seeking medical treatment following his termination and had obtained a diagnosis and plan for treatment from a doctor at the Mayo Clinic. Ultimately, Foutch agreed to extend Willnerd's redeployment pay through December 2003 because Willnerd had been occupied seeking medical treatment and because Willnerd possessed accumulated sick leave. Foutch recommended that Willnerd apply for disability insurance. Willnerd applied and received disability insurance in 2004, and he received the assistance of a job-placement specialist from the insurer at that time. In Willnerd's deposition, when First National's attorney questioned Willnerd about the November 17 meeting with Foutch, the following exchange took place:

> Q. Did you ask him to place you into open positions that did not require communication on the telephone or in person with clients on November 17?
> A. I could have - - I could have, yes.

In December 2003, Willnerd first received Botox treatment for his condition. Afterwards, he emailed Foutch, stating:

> I feel that I need a job that does not require the amount of communication with the public as my previous position[,] but I feel I can still hold a position that requires some communication with the public and my coworkers. Right now[,] I am available to work. However, if I talk for an extended period of time my voice will become fatigued.

Willnerd first applied for open positions while receiving pay in December 2003, after he sent the above-quoted email to Foutch. He continued applying for positions after his pay ceased and through October 2005. He applied for twenty-two positions, nineteen of which First National filled with other applicants, and three of which First National left unfilled.

Staebell, Foutch, and Willnerd, through deposition testimony and affidavits, present inconsistent accounts regarding Willnerd's abilities and regarding statements Willnerd made about his ability to perform certain jobs and salaries he would consider. For example, Staebell asserts that Willnerd said he would not consider jobs that paid less than $35,000 per year. Willnerd, however, denies making this statement. In fact, he applied for open positions that advertised salaries of $25,000 per year or less. Also, First National cites a signed report from one of Willnerd's physicians as evidence tending to indicate Willnerd could not communicate with the public in any manner and would not have been capable of performing some of the jobs for which he applied. The record does not indicate First National possessed this physician's statement prior to litigation. Further, the email from Willnerd to Foutch, as quoted above, describes Willnerd's limitations differently, and the physician's statement is inconsistent with the fact that Willnerd communicated effectively with clients through September 2003. Finally, the physician's statement regarding Willnerd's voice in November 2003 is not necessarily helpful in identifying the extent of Willnerd's limitations at later dates when he actually applied for various positions.

Ultimately, although Willnerd applied for twenty-two positions, he only addresses four of the positions in his arguments on appeal regarding his failure-to-hire claims. As such, not all arguments and evidence regarding Willnerd's experience with the rehiring process are particularly valuable at the present stage, even though such things ultimately may be relevant at trial regarding the questions of discrimination and pretext. We discuss in more detail below the evidence and arguments surrounding the application process and the four positions.

II.    Discussion

We review a grant of summary judgment de novo, viewing the facts in a light most favorable to Willnerd, the non-moving party, and drawing all reasonable

inferences in his favor. <u>Green v. Franklin Nat'l Bank of Minneapolis</u>, 459 F.3d 903, 910 (8th Cir. 2006).

A. Termination Claim

"We apply the familiar <u>McDonnell Douglas</u> burden-shifting framework in ADA cases." <u>Kosmicki v. Burlington N. & Santa Fe Ry. Co.</u>, 545 F.3d 649, 651 (8th Cir. 2008); <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802–04 (1973). Under this framework, Willnerd first must make out a prima facie case by showing that he was disabled within the meaning of the ADA and qualified to perform the essential functions of his job and that he suffered an adverse employment action because of his disability. <u>Kosmicki</u>, 545 F.3d at 651.[2] If Willnerd makes this showing, the burden of production shifts to First National to articulate a legitimate, non-discriminatory reason for the adverse action. <u>Id.</u> If First National meets this burden, the burden of proof lies with Willnerd to "discredit [First National's] stated reasons for terminating him and show circumstances raising a reasonable inference that the real reason for his discharge was his . . . disability." <u>Id.</u>

Employing the burden-shifting analysis, it is either undisputed or not seriously disputed that Willnerd was a disabled individual, qualified within the meaning of the ADA, and able to perform his job with or without reasonable accommodation. Willnerd's disability was open and obvious, several coworkers joked or commented about the disability, and Kisicki admitted worrying about how customers perceived

---

[2]First National argues that a different analytical framework applies in the context of a termination that occurs during a larger reduction in force. We need not address First National's arguments in this regard. Willnerd was the only person terminated at the Beatrice branch or at other, similarly sized branches, with the exception of limited reductions in tellers. At most, the summary-judgment record might present a question of fact as to whether First National carried out a reduction in force.

-10-

Willnerd. Further, performance reviews demonstrated that Willnerd, in fact, performed the essential functions of his job. Similarly, it is clear that he suffered separate adverse employment actions when First National terminated him from his position and then failed to rehire him. The evidentiary showing required at the prima facie stage is "minimal," Pope v. ESA Servs., Inc., 406 F.3d 1001, 1007 (8th Cir. 2005), and Willnerd has easily demonstrated the first two elements of his prima facie case.

The fighting issue in the present dispute, then, is causation. The district court issued two alternative holdings: (1) Willnerd failed to create a triable question of fact at the prima facie stage regarding a causal relationship between discriminatory intent and the adverse employment actions; and (2) Willnerd failed to create a triable question of fact as to whether the defendant's proffered reason for the adverse employment actions were pretextual, i.e., Willnerd failed to carry his ultimate burden of proving discrimination. Because we conclude that Willnerd presented sufficient evidence to create a jury question as to the final step of pretext and discrimination *vel non*, it is not necessary to discuss the earlier, lesser, threshold issue of causation in the prima facie stage. See, e.g., Logan v. Liberty Healthcare Corp., 416 F.3d 877, 881 (8th Cir. 2005) ("An employee's attempt to prove pretext requires more substantial evidence than it takes to make a prima facie case because unlike evidence establishing a prima facie case, evidence of pretext and retaliation is viewed in light of the employer's justification." (quotations, and alterations omitted)).

First National's proffered reason for terminating Willnerd was twofold: (1) someone had to be fired at the Beatrice branch because the community was experiencing poor economic conditions and the branch was overstaffed relative to the income it generated; and (2) Willnerd's position was the most expendable, and he was not performing well. In support of this position, First National stated a number of business reasons for needing to terminate an employee at the Beatrice branch. It also provided a number of business reasons for why Willnerd, specifically, was the

employee it chose for termination. In making these general assertions, First National made a number of more detailed factual claims, many of which Willnerd contested in the district court, citing support in the summary-judgment record. Evidence Willnerd cited included such things as performance data from comparable branches and historical performance data from the Beatrice branch. In addition, he obtained expert testimony from an economist regarding the state of economic affairs in Beatrice.

In general, it is not the court's role to second-guess businesses' assessments of general economic conditions, their own performance, and their own staffing needs. Dorsey v. Pinnacle Automation Co., 278 F.3d 830, 837 (8th Cir. 2002). As such, we elect not to focus on the portion of First National's proffered explanation describing its general business reasons for needing to terminate an employee at the Beatrice Branch. We focus instead on the factual issues surrounding First National's specific selection of Willnerd as the employee for termination.

Regarding the selection of Willnerd, the following factors, viewed cumulatively, are sufficient to generate a triable question of fact regarding pretext and discriminatory animus. First, Ulferts imposed a production quota on Willnerd that reasonable jurors could view as unattainable and as an effort to ensure Willnerd's failure. Second, Ulferts and Kisicki made inconsistent statements regarding whether they considered other employees for termination. Third, other employees purportedly considered for termination were performing poorly and were not subject to quotas, or ultimately, termination. Fourth, the person to whom First National assigned most of Willnerd's duties was underutilized prior to the assignment, subsequently failed to perform at Willnerd's level, and was subjected to no adverse actions as a consequence. Fifth, Spangler and Willnerd were similarly situated, with identical job descriptions, and Willnerd outperformed Spangler. Spangler, however, received no quota and remained in his position despite his inability—and, in fact, the inability of the entire branch—to meet the production level First National demanded of Willnerd. Finally, Kisicki admitted he was concerned about how customers perceived Willnerd.

-12-

Regarding the quota, we have previously held that it is permissible for a jury to view the imposition of an unattainable goal as evidence of pretext because a jury may reasonably view the goal or production quota as an effort to set up an employee for failure. Denesha v. Farmers Ins. Exch., 161 F.3d 491, 499 (8th Cir. 1998) (holding the imposition of unattainable production goals on an employee was evidence supporting a jury's finding of discrimination). Given the branch's past performance and the practice of having personnel refer home-equity borrowers to Weers, a jury reasonably could view the production quota as unattainable and as an effort to ensure Willnerd's failure. Imposition of the quota in February 2002, the termination in September 2003, and the reasonable inferences associated with these actions, therefore, undercut Ulfert's assertion that economic conditions in May 2003 drove a comparative analysis of positions that resulted in the decision to terminate Willnerd.

This inference is made all the more reasonable by the fact that Willnerd alone received a quota when Willnerd was not underperforming relative to Spangler and the two personal bankers at the Beatrice branch were underperforming relative to their peers. As noted above, Spangler generated less loan volume than Willnerd after Willnerd received the quota and after Spangler's position changed to focus on sales. Spangler and Willnerd, who had identical written job descriptions for over one year prior to Willnerd's termination, were sufficiently similarly situated for a jury to consider differential treatment as evidence of discrimination. See McNary v. Schreiber Foods, Inc., 535 F.3d 765, 770 (8th Cir. 2008) ("Instances of disparate treatment can support a claim of pretext, but [plaintiff] has the burden of proving that he and the disparately treated [employees] were similarly situated in all relevant respects." (quotation omitted)). Further, although not necessarily similarly situated when compared to Willnerd, the personal bankers clearly were underperforming relative to their comparable peers. The two personal bankers in Beatrice were ranked last and second-to-last among the eighty-seven personal bankers in First National's entire multi-branch system in terms of meeting incentive benchmarks. Also, Ulferts and Kisicki expressly noted after-the-fact that the personal bankers were not doing an

adequate job of cross-selling services or referring customers for additional services. The failure to impose quotas and consequences on the underperforming personal bankers, therefore, further undercuts Ulfert's claim that Willnerd's termination was based on performance concerns.

First National attempts to distinguish Spangler from Willnerd by emphasizing that Spangler had additional duties regarding the maintenance of deposit accounts. Shortly after Willnerd's termination, however, First National removed deposit-account duties from the list of criteria it relied upon to assess Spangler's performance. A reasonable jury could view this act as evidence that First National did not consider these additional duties to be an important part of Spangler's work. As such, a jury reasonably could view First National's attempt to distinguish Spangler and Willnerd as a disingenuous argument or after-the-fact explanation for Willnerd's termination. See id. (requiring employees to be similarly situated in all *relevant* aspects).

Regarding the conflicting statements by Ulferts and Kisicki, Ulferts stated in his March 2004 memo that he decided to retain Spangler, in part, because he viewed Spangler as having better community connections and better potential as a salesperson. Performance data for Spangler and Willnerd undercuts Ulferts assertion, as does the conflicting statement from Kisicki, who said, "we were mainly focused on Jeff [Willnerd]. This wasn't really - this was about Jeff's performance. It wasn't about Jim [Spangler]'s performance." These conflicting descriptions about the decisionmaking process provide further support for Willnerd's argument that the proffered, performance-related rationale is pretextual.

Regarding Faxon, it is undisputed that she was underutilized prior to Willnerd's termination due to the reassignment of her duties to Omaha—she frequently completed her limited duties by 10:00 a.m. although she was a full-time employee receiving a full-time salary. After Willnerd's termination, First National assigned loan-production duties to Faxon, but she failed to produce at Willnerd's level and

required training to achieve even that lesser degree of performance. In fact, the entire branch's staff, combined, failed to generate home-equity loans at the level demanded of Willnerd in his quota. Nevertheless, Faxon, like other staff at the Beatrice branch, suffered no consequences in the form of production quotas, ultimatums, or terminations. These facts further undercut First National's claim that it terminated Willnerd due to his performance.

Finally, Keslar and Kisicki admitted discussing their concerns regarding Willnerd's voice impediment and customers' perceptions of Willnerd. While we do not necessarily view these admissions as direct evidence of discriminatory animus, a reasonable jury certainly may consider these statements alongside the other evidence in assessing pretext and the question of discriminatory intent. A reasonable juror could infer from the various reports of discussions between Keslar and Kisicki, discussions between Keslar and customers, and discussions with Willnerd himself, that First National's decisionmakers are now downplaying the role that Willnerd's condition played in the decision to terminate his employment. Taken cumulatively, Willnerd has presented sufficient evidence to generate a triable question of fact as to pretext and the ultimate question of discriminatory intent.

B.    Failure-to-Hire Claim

Regarding the failure-to-hire claim, Willnerd limits his arguments on appeal to four positions: (1) Senior Loan Operations Assistant; (2) Assistant Branch Manager; (3) Senior Credit Analyst; and (4) Mortgage Loan Officer. For each of these positions, the familiar burden-shifting analysis applies, and we consider the failure to hire to be an adverse action. See Christensen v. Titan Distribution, Inc., 481 F.3d 1085, 1093 (8th Cir. 2007). Accordingly, if a reasonable jury could conclude for these positions that Willnerd was a "qualified individual," as the ADA defines that term, 42 U.S.C. § 12111(8), we may advance our analysis to the proffered-rationale and pretext stages. Given the nature of the arguments and evidence surrounding these four

positions, we address the first two positions together and the last two positions together.

### i. Senior Loan Operations Assistant and Assistant Branch Manager

"Analyzing whether a person is a qualified individual is a two-step process: first, we determine whether the individual possesses the requisite skills for the job; second, we must determine whether the individual can perform the essential functions of the job, with or without reasonable accommodation." Canny v. Dr. Pepper/Seven-Up Bottling Group, 439 F.3d 894, 900 (8th Cir. 2006). Whereas, in the context of his termination claim, we easily concluded Willnerd had shown he was a qualified individual under the ADA who was able to perform the essential functions of his prior job with or without reasonable accommodation, more discussion is required for these positions.

It appears that First National does not argue Willnerd lacked "the requisite skills" for these two jobs in terms of knowledge or experience. Id. Rather, First National argues only that Willnerd could not "perform the essential functions of the job[s], with or without reasonable accommodation." Id. We reject this argument because there are outstanding questions of fact regarding the extent of Willnerd's limitations at the times he applied for these two positions. Viewing the record in a light most favorable to Willnerd, there is sufficient evidence for a reasonable jury to conclude his limitations were not so severe as to prevent him from performing the essential functions of these positions. We note in particular that the record is not well-developed as to the precise requirements and essential functions for these positions, and it is the employer's task to identify the essential functions for a job. See, e.g., Dropinksi v. Douglas County, 298 F.3d 704, 707 (8th Cir. 2002) (stating that when an employer disputes allegations that a plaintiff can perform the essential functions of a job, the employer must present evidence establishing those functions).

-16-

As such, when the summary-judgment record is not well developed in this regard, it is not necessarily a difficult task for a plaintiff to prove himself or herself qualified.

Willnerd argues essentially that, throughout the application process, his voice limitations were as set forth in his December 2003 email to Foutch. First National, however, argues that Willnerd's limitations were more severe and that he could not perform in any position that required speaking with clients. First National points to the signed document from one of Willnerd's physicians at the Mayo Clinic, dated November 2003, and to the arguable concession that Willnerd made during his depositions when questioned about statements made to Foutch at the November 17, 2003 meeting, as quoted above.

The physician's document stated, "Mr. Willnerd's speech difficulty, which is almost certainly neurologic in origin, is disabling relative to work requiring effective speech. In my opinion, at this time, his deficits are severe enough to preclude his being effective in any job requiring phone work or direct speaking contact with clients." First National points to no evidence tending to show that they possessed this document prior to litigation or based their hiring decisions on this document. As such, the report, at most, is contested evidence of Willnerd's limitations at that point in time. For summary-judgment purposes, we cannot view the document as the final word regarding Willnerd's limitations. The physician's report is inconsistent with the fact that Willnerd performed in a client-contact job through September 2003, it overstates Willnerd's limitations relative to Willnerd's December 2003 email to Foutch, it overstates the limitations relative to assertions Willnerd made in his application for disability benefits, and it is not necessarily helpful as evidence regarding the precise extent of Willnerd's limitations following his Botox treatment or surgery.

Also, we must reject First National's attempt to rely upon its characterization of what Willnerd may have said to Foutch at the November 17, 2003 meeting. First National's position in this regard is supported only by an impermissibly favorable

reading of an unclear response in Willnerd's deposition. Further, it is contrary to Willnerd's description of his limitations and abilities as set forth in the December 2003 email. It is undisputed that Foutch received this latter description prior to Willnerd's application for any of the four positions in question. As such, although a jury might ultimately conclude Willnerd was not a "qualified individual," he has presented sufficient evidence to avoid summary judgment on these grounds.

First National offered no further explanation regarding the Assistant Branch Manager position, so we need not address that claim further. Regarding the Senior Loan Operations Assistant position, First National proffered its selection of a more qualified applicant as the legitimate reason for not hiring Willnerd. First National states, "the manager hired a more qualified candidate who had more loan operations experience." First National has not fully explained what is meant by the term "loan operations experience," and we may not interpret this term in an expansive manner contrary to the interest of the non-moving party. Green v. Franklin Nat'l Bank, 459 F.3d 903, 910 (summary-judgment standard). While it is true that First National bears only the burden of production and not the burden of proof in stating a reason for its actions, by failing to more specifically articulate the job requirements and how those requirements relate to the candidates' relative merits, First National has made it relatively easy for Willnerd to create a triable question of fact as to pretext.

The applicant First National selected had one year of post-secondary education, worked as a commercial-loan secretary from 1976 through 1993 and worked as a "loan documentation specialist" at a bank from 1993 through 1998. This person, however, had not worked in a loan-related position for approximately seven years prior to her selection because she had been working in a human-resources position. Willnerd, in contrast, had over twenty years of loan-related experience with First National and had completed more post-secondary education than the other applicant. Importantly, Willnerd's loan-related experience extended through his termination in 2003.

-18-

It is not necessarily the case that Willnerd was more qualified than the person actually hired, and at the end of the day, a jury may well accept First National's proffered rationale. Also, employers generally are entitled to make their own assessments regarding applicants' qualifications and the relative merits of different applicants. Ottman v. City of Independence, 341 F.3d 751, 757–58 (8th Cir. 2003). That having been said, all Willnerd must do to avoid summary judgment is create a jury question as to the issues of pretext for discrimination. On the present record, given the paucity of information detailing what precisely First National considered relevant experience and the lack of any clear superiority in the other applicant's qualifications, we believe a jury could find the proffered rational to be pretextual. See Christensen, 481 F.3d at 1094–95 ("If a jury doubts the employer's offered reasons, it can base a finding of intentional discrimination on a combination of the prima facie case and its doubt of the employer's reason, especially if the doubt is 'accompanied by a suspicion of mendacity.'" (quoting Hartley v. Dillard's, Inc., 310 F.3d 1054, 1058 (8th Cir. 2002))).

### ii. Senior Credit Analyst and Mortgage Loan Originator

As to the final two positions, First National does not argue Willnerd was physically unable to "perform the essential functions of the job[s], with or without reasonable accommodation." Id. at 1093. Rather, it argues only that he did not possess "the requisite skills for the job[s]." Canny, 439 F.3d at 900. This argument is relevant not only to the "qualified individual" element of the prima facie case, it also serves as First National's proffered rationale for its hiring decision. As such, it is relevant to the final questions of pretext and discriminatory intent.

Regarding the Mortgage Loan Officer position, First National claimed Willnerd did not have five years of mortgage and real-estate experience, as was advertised as a requirement for the position. Willnerd, however, had extensive experience with mortgages through his work at First National, which had exceeded five years.

Incredibly, First National advances this argument even though Willnerd is able to cite from the record a statement from an employee at First National's job placement center who specifically noted Willnerd's mortgage experience. That employee, when informing Willnerd that a certain, different job would not be appropriate, reviewed Willnerd's credentials and stated, "I wish I had a mortgage lending position to which I could introduce you, Jeff, but I do not at the present time." Given this statement, and given Willnerd's extensive experience, we easily find that there is a triable question of fact as to the issue of Willnerd's qualifications for the Mortgage Loan Officer position. This finding is relevant to both the prima-facie case and the ultimate questions of pretext and discrimination.

Similarly, regarding the Senior Credit Analyst position, First National asserts Willnerd did not meet the minimum qualifications. Specifically, First National stated Willnerd "was not hired for the Senior Credit Analyst position because he did not meet the minimum qualifications, namely, he did not have the required credit card industry experience." A jury could find Willnerd qualified and also find pretext based on this explanation. Not only did Willnerd, in fact, have relevant credit card and credit underwriting experience through his work with First National, the job description for this position made no reference to "credit card industry experience." Accordingly, as with the two previous positions, Willnerd has presented sufficient evidence to preclude summary judgment regarding these final two failure-to-hire claims.

III.    Conclusion

We reverse the judgment of the district court and remand for further proceedings not inconsistent with this opinion.

_____