# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 06-3021

———————

Fred Gilbert,

        Appellant,

   v.

Des Moines Area Community College,

        Appellee,

Robert Denson; Kim Linduska; Darrell Roberts; Sandy Tryon; Larry Ebbers,

        Defendants.

Appeal from the United States District Court for the Southern District of Iowa.

———————

Submitted: March 6, 2007
Filed: August 8, 2007

———————

Before RILEY, HANSEN, and MELLOY, Circuit Judges.

———————

RILEY, Circuit Judge.

Fred Gilbert (Gilbert) appeals the district court's[1] summary judgment in favor of Des Moines Area Community College (DMACC) on Gilbert's claims of racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964,

———————

[1]The Honorable Harold D. Vietor, United States District Judge for the Southern District of Iowa.

42 U.S.C. §§ 2000e to 2000e-17, and the Iowa Civil Rights Act (ICRA), Iowa Code chapter 216.  We affirm.

## I.  BACKGROUND

In May 2003, DMACC commenced a search for a new president.  DMACC has six separate campuses, one of which is known as the Urban Campus.  At the time of DMACC's search, Gilbert served as Urban Campus Provost[2] of DMACC's Urban Campus and was responsible for the operation and administration of that campus.

To assist with the presidential search, DMACC's Board of Directors hired Dr. Larry Ebbers (Dr. Ebbers), an Iowa State University professor teaching courses focusing on community college organization and higher education administration. Dr. Ebbers suggested a small screening committee initially review the applications and select six to eight candidates to present to a larger search committee.  The search committee then would meet to discuss and rank the candidates and select three to five finalists for recommendation to DMACC's Board of Directors to interview.

DMACC received approximately forty-eight presidential applications, including Gilbert's.  On July 2, 2003, the screening committee, which consisted of four DMACC Board of Directors members, met with Dr. Ebbers to review the applications. The screening committee reviewed the applications and ranked Gilbert twelfth. When asked by the screening committee regarding the number of candidates to forward to the search committee, Dr. Ebbers suggested submitting twelve candidates because Gilbert, an African-American, was ranked twelfth.  Later, an application was submitted by another African-American candidate.  Thus, to increase the diversity of

_____

[2]Before September 2003, DMACC referred to the leaders of the six campuses as "executive deans."  The title for this position later was changed to "provost." Regardless of the change in name, the responsibilities of each position essentially remained unchanged.

the pool of candidates, the screening committee ultimately presented thirteen candidates to the search committee.

Dr. Ebbers then met with the thirty-member search committee, which consisted of faculty, staff, students, alumni, and community members. The search committee was asked to review the thirteen candidate applications before meeting again on July 14, 2003. Between July 2 and 14, 2003, Dr. Ebbers contacted at least three references on each candidate's reference list, as well as three other persons who were familiar with the candidate, and prepared a written summary of his reference checks.

At the July 14 meeting, the search committee discussed the thirteen candidates. Dr. Ebbers directed the search committee to rank each of the candidates from one (most qualified) to thirteen (least qualified). The candidate receiving the lowest numerical score would be the highest-ranked candidate. The four highest-ranked candidates (finalists) were: Kim Linduska (Linduska), with 73 points; Robert Denson (Denson), with 75 points; Karen Rafinski (Rafinski), with 93 points; and Jean Goodenow (Goodenow), with 129 points. The fifth-ranked candidate had a score of 194 points. Gilbert was ranked eleventh with 278 points. The other African-American candidates were ranked sixth and twelfth, receiving 226 points and 280 points, respectively. The search committee recommended the Board of Directors interview the finalists.

Dr. Sandy Tryon (Dr. Tryon), DMACC's Executive Director of Human Resources and designated Affirmative Action Officer, examined the presidential search process as part of an affirmative action review. This review included examining the scores of the finalists and comparing that range to the scores received by the three African-American candidates. Dr. Tryon concluded none of the African-American candidates received a point score sufficiently close to the scores of the finalists to receive an interview; thus, no additional candidates were added to the interview list.

The Board of Directors interviewed the finalists for the presidency position and ultimately selected Denson (President Denson), who had been serving as president of Northeast Iowa Community College since 1998.

On March 29, 2004, Gilbert filed a complaint with the Iowa Civil Rights Commission (ICRC), and cross-filed the complaint with the Equal Employment Opportunity Commission (EEOC), alleging discrimination on the basis of age, race, color, and retaliation. On September 21, 2004, after receiving a right-to-sue letter, Gilbert filed a lawsuit against DMACC and various individuals (collectively, the defendants) in state district court, which was later removed to federal court.

After Gilbert filed suit and in preparation for responding to Gilbert's complaint, DMACC officials began investigating both the presidential search process and Gilbert's application. During the course of the investigation, DMACC officials discovered substantial portions of essay answers in Gilbert's application were plagiarized almost word-for-word from two separate textbooks. Gilbert's application included a signed certification stating, "I understand that any misrepresentation or omission may be grounds for rejection of my application for current and future employment or for termination if I have been employed." On December 4, 2004, during an interview with Dr. Tryon, DMACC's counsel, and Gilbert's counsel, Gilbert acknowledged his application contained plagiarized materials, but Gilbert denied having knowledge of or being involved in the actual act of plagiarism. Gilbert stated (1) he had hired a consultant to assist him in completing his application, (2) the consultant prepared the essay answers for Gilbert and apparently committed the act of plagiarism, and (3) he was unaware any plagiarism had occurred.

DMACC officials interviewed Gilbert again on December 22, 2004,[3] and Gilbert again claimed the consultant, whom Gilbert stated he had paid about one

---

[3]Gilbert was represented by legal counsel and was placed under oath. Following the meeting, DMACC prepared a transcript of the meeting.

thousand dollars in cash (with no receipt from the consultant), had prepared the essay answers. However, Gilbert could not recall the consultant's name, the number of times he met with the consultant, or the length of their meetings. Gilbert was unable to provide a description of the consultant. When asked whether the consultant was male or female, Gilbert replied, "Both." Gilbert then said, "I met with more than one sex." When asked how many people he consulted, Gilbert stated, "It would be one or two, because I think there was [*sic*] two, but I'm not sure."

Based on the results of DMACC's investigation, the DMACC Board of Directors voted to terminate Gilbert's contract as Urban Campus Provost on the ground "Dr. Gilbert's application for President of DMACC contained substantial acts of plagiarism and acts of misrepresentation." The decision to remove Gilbert from academic administrative employment was influenced largely by DMACC's consideration of Gilbert's academic governance duties, which included administering academic programs and determining sanctions for academic misconduct. In President Denson's words, "plagiarism is a serious matter in academia," and DMACC "did not want Dr. Gilbert in a position where [Gilbert was] judging students for plagiarism when he has been involved in plagiarism." DMACC offered Gilbert a new position as a grants specialist, which carried a significant reduction in salary.

Gilbert's lawsuit alleged (1) DMACC's decision not to hire Gilbert for the position of president was motivated by race, and (2) DMACC retaliated against Gilbert based on Gilbert's engagement in protected activity. The district court granted summary judgment in DMACC's favor on both claims.[4] Gilbert appeals.

---

[4]Gilbert also alleged claims against DMACC and five individual defendants for racial harassment, conspiracy to violate civil rights, and intentional interference with Gilbert's employment contract. The district court granted summary judgment in the defendants' favor on these claims as well. On appeal, Gilbert solely challenges the district court's dismissal of the racial discrimination and retaliation claims against DMACC.

## II. DISCUSSION[5]

### A. Standard of Review

We review de novo an order granting summary judgment. Green v. Franklin Nat'l Bank of Minneapolis, 459 F.3d 903, 910 (8th Cir. 2006). Summary judgment is proper if, after viewing all the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Libel v. Adventure Lands of Am., Inc., 482 F.3d 1028, 1033 (8th Cir. 2007). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007). We may affirm a district court's grant of summary judgment on any basis supported by the record. Tenge v. Phillips Modern Ag. Co., 446 F.3d 903, 906 (8th Cir. 2006).

### B. Racial Discrimination Claim

Gilbert first contends the district court erred in finding there was no genuine issue of material fact regarding whether race was a motivating factor in DMACC's decision not to hire Gilbert as president. Because Gilbert fails to produce direct evidence to support his claim of intentional racial discrimination, we analyze his claim under the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[6] See Wells v. SCI Mgmt., L.P., 469 F.3d 697, 700

---

[5]We analyze ICRA claims under the same analytical framework used for Title VII claims. See Johnson v. Univ. of Iowa, 431 F.3d 325, 332 (8th Cir. 2005).

[6]As an initial matter, Gilbert attacks the district court's method of analysis, arguing Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003), modified the McDonnell Douglas burden-shifting analysis by clarifying Title VII only requires a showing that discrimination was *a* motivating factor in an employment decision. Gilbert contends the district court employed a more restrictive standard at the summary judgment stage by analyzing Gilbert's claim pursuant to McDonnell Douglas and erroneously required Gilbert to demonstrate race was the *sole* motivating factor in the challenged employment decision. We disagree. We previously have rejected the argument that

(8th Cir. 2006). Under this analytical framework, once the plaintiff employee establishes a prima facie case of discrimination, the burden shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for its actions. McDonnell Douglas, 411 U.S. at 804; Wells, 469 F.3d at 701. If the defendant offers such a reason, the burden shifts back to the plaintiff to put forth evidence showing the defendant's proffered explanation is a pretext for unlawful discrimination. McDonnell Douglas, 411 U.S. at 804; Wells, 469 F.3d at 701.

For summary judgment purposes, DMACC concedes Gilbert established a prima facie case of discrimination. Thus, we need only determine whether DMACC articulated a legitimate, nondiscriminatory reason for its actions, and, if so, whether Gilbert demonstrates a genuine issue of material fact with respect to pretext.

DMACC asserts Gilbert was not selected for an interview due to Gilbert's low search committee score and the superior qualifications of the four finalists. The record indicates the search committee members were directed to review independently each candidate's application materials before meeting as a group. At the July 14, 2003, meeting, the search committee discussed and considered the applicants' education, leadership, and job experience, including prior experience in serving as president of a community college, working with governing boards of directors, and executing board policy. Furthermore, the search committee also discussed Gilbert's experience as leader of the Urban Campus, as well as the size differential between the Urban Campus and DMACC as a whole. During the meeting, Dr. Ebbers reported on comments received from each applicant's personal references, and he also solicited

Desert Palace modified our court's use of the three-part McDonnell Douglas analysis at the summary judgment stage of an employment discrimination lawsuit. See Griffith v. City of Des Moines, 387 F.3d 733, 735-36 (8th Cir. 2004). The district court properly analyzed Gilbert's claim under the McDonnell Douglas analytical framework, and we find nothing in the record to indicate the district court improperly hinged Gilbert's race discrimination claim on Gilbert's ability to show race was the sole factor in DMACC's decision not to promote Gilbert to the position of president.

comments regarding each candidate from the search committee. Following this process, the search committee ranked Gilbert eleventh out of the thirteen candidates. Although Gilbert and the four finalists had relatively comparable academic credentials,[7] the finalists all were sitting or acting interim presidents of community colleges who reported directly to a governing board of directors.[8] Gilbert, in contrast, lacked community college presidential experience.

Following the search committee's decision, Dr. Tryon performed an affirmative action review. Based on a review of all thirteen candidates' rankings and point allocations, Dr. Tryon determined none of the minority candidates were close enough in points to the finalists to be interviewed. On these facts, we conclude DMACC offered legitimate, nondiscriminatory reasons for not selecting Gilbert for an interview.

Thus, the burden shifts to Gilbert to produce evidence sufficient to create a genuine issue of material fact regarding whether DMACC's proffered reasons are mere pretext for intentional discrimination. Before the district court, Gilbert argued

---

[7]At the time of DMACC's presidential search, Gilbert held a master's degree in educational administration and a doctorate in philosophy, focusing on higher education administration. President Denson held a master's degree in education administration and a juris doctorate. Linduska held a master's degree in industrial vocational technical education and was to be awarded a doctorate in higher education in December 2003. Rafinski held a master's degree in physical education, a master's degree in public administration, and a doctorate in educational policy studies. Goodenow held a master's degree in rehabilitative counseling and a doctorate in higher education administration.

[8]At the time of the presidential search, President Denson had been serving as president of Northeast Iowa Community College since 1998. Linduska had been serving as DMACC's acting interim president from March 2003 until President Denson's appointment, and she previously served as DMACC's senior vice president for academic affairs, where she was Gilbert's supervisor. Rafinski and Goodenow had been serving as community college presidents since 1992 and 1996, respectively.

a finding of pretext is supported by DMACC's failure to follow its affirmative action policy and its practice of interviewing internal applicants as well as by Gilbert's similar or superior qualifications as compared to the finalists. On appeal, Gilbert attempts to buttress his pretext argument with several additional contentions.[9] We reject Gilbert's belated attempt to advance new arguments or theories not presented below. See Orr v. Wal-Mart Stores, Inc., 297 F.3d 720, 725 (8th Cir. 2002) ("Ordinarily, we do not consider an argument raised for the first time on appeal. We consider a newly raised argument only if it is purely legal and requires no additional factual development, or if a manifest injustice would otherwise result." (internal citations omitted)). Gilbert contends the district court was generally informed of these facts and issues argued now on appeal. We follow our standard practice and limit our review to the specific arguments Gilbert raised before the district court in support of a finding of pretext, as opposed to those arguments the district court *might* have deduced from the record as a whole. "A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." White v. McDonnell Douglas Corp., 904 F.2d 456, 458 (8th Cir. 1990) (per curiam) (quotation omitted). Nor will our court "mine a summary judgment record searching for nuggets of factual disputes to gild a party's arguments." Rodgers v. City of Des Moines, 435 F.3d 904, 908 (8th Cir. 2006). We therefore turn our attention to those arguments that are properly before us.

---

[9]Specifically, Gilbert argues the following are evidence of pretext: (1) DMACC's claim Gilbert was not interviewed based on the search committee's findings, because the search committee had nothing to do with the decision not to interview Gilbert; (2) DMACC's claim it considered the candidates' prior presidential experience or the difference in size of the campuses managed by the candidates in assessing the candidates' qualifications; and (3) DMACC's failure to ever investigate a discrimination claim by Gilbert. On appeal, Gilbert also launches a broad-ranging attack on DMACC's affirmative action policy, arguing DMACC failed to observe its policy throughout the entire search process and did nothing to review the process except look at the final numbers.

Gilbert first contends DMACC failed to perform an affirmative action review of the search committee's selection process.[10] We disagree. Dr. Tryon's involvement in the presidential search process included discussing with Dr. Ebbers on various occasions: the advertisement for the position of president, the search process and the timeline to be followed, the makeup of the search committee, and the progress of the search process. Additionally, after the search committee's votes were tabulated, Dr. Tryon reviewed the score range of the finalists and compared that range to the scores received by the three minority candidates. Dr. Tryon and Dr. Ebbers noted the substantial gap in the scores between the fourth-ranked candidate and the fifth and sixth-ranked candidates. Dr. Tryon concluded none of the minority candidates received a total point score sufficiently close to the scores of the finalists selected for an interview.

Gilbert next argues DMACC's failure to follow its practice of interviewing qualified internal candidates demonstrates pretext. Again, we disagree. Although Gilbert presented evidence DMACC has an unwritten practice of interviewing qualified internal candidates, we are unable to find any evidence in the record this practice has ever been applied specifically to the position of DMACC president. Even assuming DMACC ignored this practice with regard to the president position, the disparity in scores between Gilbert and the finalists contradicts Gilbert's claim that DMACC's alleged deviation from its unwritten policy occurred based on racial

---

[10]Again, Gilbert's opening brief on appeal is brimming with newly-asserted and broad-ranging attacks on DMACC's affirmative action policy. In contrast to his limited argument before the district court, Gilbert now argues DMACC failed to observe its policy throughout the entire search process and raises specific criticisms and suggestions regarding what DMACC should have done differently. Because we find no good reason to depart from the general rule of avoiding consideration of an issue not passed upon below, we again decline to address Gilbert's belated contentions. See Stafford v. Ford Motor Co., 790 F.2d 702, 706 (8th Cir. 1986) (recognizing a contrary rule allowing consideration on appeal of newly raised arguments "could encourage a party to 'sandbag' at the district court level, only then to place his 'ace in the hole' before the appellate court").

-10-

discrimination. See Chock v. Nw. Airlines, Inc., 113 F.3d 861, 864-65 (8th Cir. 1997) (affirming summary judgment in employer's favor where plaintiff presented no evidence employer's deviation from established promotion policies occurred due to racial discrimination). Thus, the failure to afford Gilbert an interview based on DMACC's unwritten practice does not constitute evidence of pretext sufficient to rebut DMACC's legitimate basis for not selecting Gilbert for an interview.

Finally, Gilbert attacks DMACC's reliance on presidential experience in evaluating candidates and argues the finalists were less qualified than Gilbert was for the position of president. Evidence of similar qualifications between Gilbert and the selected candidates is insufficient to support a finding of pretext; rather, Gilbert must show the finalists were less qualified than he. See Kincaid v. City of Omaha, 378 F.3d 799, 805 (8th Cir. 2004). "Although an employer's selection of a less qualified candidate can support a finding that the employer's nondiscriminatory reason for the hiring was pretextual, it is the employer's role to identify those strengths that constitute the best qualified applicant." Id. (internal quotation marks and alterations omitted). However, we repeatedly have noted "the employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 781 (8th Cir. 1995); see, e.g., Arraleh v. County of Ramsey, 461 F.3d 967, 976 (8th Cir. 2006), cert. denied, 127 S. Ct. 2100 (2007); Kincaid, 378 F.3d at 805.

Although DMACC did not *require* prior presidential experience at a community college when screening candidates, such experience was considered a strength in evaluating the candidates' job experience and leadership skills. Gilbert possessed similar educational qualifications as the finalists, but he lacked prior presidential experience. Viewed in the light most favorable to Gilbert, the record shows Gilbert's qualifications, at best, were somewhat similar to those of the finalists, which is

insufficient to rebut DMACC's legitimate reason for not selecting Gilbert. Gilbert fails to demonstrate a genuine issue of material fact regarding whether DMACC chose a less qualified applicant. See Pierce v. Marsh, 859 F.2d 601, 604 (8th Cir. 1988) ("The mere existence of comparable qualifications between two applicants . . . alone does not raise an inference of racial discrimination.").

Having reviewed Gilbert's remaining allegations on this issue, we find the allegations unavailing. Because Gilbert offered insufficient evidence to rebut DMACC's legitimate, nondiscriminatory reasons for not selecting Gilbert to interview for the position of DMACC president, summary judgment in DMACC's favor was proper on this claim.

### C.    Retaliation Claim

To establish a prima facie case of retaliation, Gilbert must demonstrate (1) he engaged in statutorily protected activity, (2) he suffered an adverse employment action, and (3) a causal connection exists between the two. See Thomas, 483 F.3d at 530. Because Gilbert presented no direct evidence of retaliation, we analyze his claim under the McDonnell-Douglas burden-shifting analysis. See id. DMACC does not dispute Gilbert engaged in protected activity when Gilbert filed a complaint with the ICRC on March 29, 2004, and when Gilbert filed the instant lawsuit on September 21, 2004. Thus, we turn our attention to the remaining elements of Gilbert's prima facie case.

The anti-retaliation provision of Title VII protects individuals "from retaliation that produces an injury or harm." Burlington N. & Santa Fe Ry. Co. v. White (White), 548 U.S. __, 126 S. Ct. 2405, 2414 (2006). The standard is an objective one, requiring the plaintiff to demonstrate "a reasonable employee would have found the challenged action materially adverse," and the employer's action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 2415 (internal quotation marks omitted).

-12-

Gilbert argues he suffered four adverse employment actions: (1) his demotion to the position of grants specialist; (2) his receipt of a letter from President Denson directing Gilbert to improve his performance with regard to managing the Urban Campus budget; (3) President Denson's request that Gilbert not select President Emeritus Joseph Borgen (Borgen) as a speaker for an Urban Campus open house ceremony; and (4) his assignment to an open cubicle near a security camera dome following his demotion. The district court determined that although Gilbert's demotion constituted an adverse employment action, the remaining events did not. We agree.

With regard to President Denson's letter to Gilbert, the letter discussed certain budget management goals and stated DMACC would "take appropriate disciplinary action" if these goals were not met. "[U]nder White, retaliatory actions must be material, producing significant rather than trivial harm." Devin v. Schwan's Home Serv., Inc., __ F.3d __, __, No. 06-3551, 2007 WL 1948310, at *5 (8th Cir. July 6, 2007). Gilbert fails to identify any objectively adverse (let alone significant) injury or harm resulting from the letter. Considering the document in its entirety, we cannot say the letter would "have dissuaded a reasonable worker from making or supporting a charge of discrimination." White, 126 S. Ct. at 2415. Even assuming the letter constituted an adverse employment action, Gilbert makes no argument concerning a causal connection between his protected activity on March 29, 2004, and the July 21, 2004, letter. Indeed, DMACC's criticisms of Gilbert's budgetary problems predated Gilbert's engagement in protected activity, which weakens any inference of a causal connection. See Kasper v. Federated Mut. Ins. Co., 425 F.3d 496, 503 (8th Cir. 2005) (recognizing an employer's criticism of a plaintiff's performance before the plaintiff engaged in protected activity diminished any inference of causation).

We reach a similar conclusion regarding the objection to Gilbert's preference to select Borgen as a speaker for an Urban Campus ceremony. In late August 2004, President Denson requested Borgen not speak at the ceremony given (1) Borgen's

-13-

submission of an affidavit in connection with Gilbert's legal matter with DMACC, (2) President Denson's and Gilbert's efforts to ensure there was "no carry-over between [Gilbert's] legal matter and [his] activities as Provost," and (3) President Denson's wish to avoid distracting from the ceremony or having anyone distort any comments Borgen might make. President Denson offered to recognize Borgen for his accomplishments at DMACC and for Borgen's efforts at the Urban Campus. President Denson further noted he had "absolutely no problem" with Gilbert's other chosen speaker. Again, nowhere does Gilbert allege this event caused him significant harm or injury. In our view, President Denson's request that Gilbert not select Borgen as a speaker would not have deterred a reasonable employee from engaging in protected activity.

Finally, Gilbert's assignment to a cubicle near a smoked glass security dome following his demotion did not constitute an adverse employment action. DMACC officials classified Gilbert's new position as a grants specialist as a "'cubicle' job, not an 'office' job," and thus did not require a private office. Additionally, the department to which Gilbert was assigned only had one available spot, which happened to be located near a security dome. The security dome at issue did not contain an actual camera and was installed in the accounts receivable and financial aid areas to give students, not employees, the impression a security camera might be located in those areas. Gilbert's new work space may not have been as desirable as his previous quarters while serving as DMACC's Urban Campus Provost, but Title VII does not protect employees "from those petty slights or minor annoyances that often take place at work and that all employees experience." White, 126 S. Ct. 2415. This event does not constitute an actionable harm.

Returning to the issue of Gilbert's demotion, we agree with the district court that Gilbert's demotion clearly was an adverse employment action, which occurred after Gilbert filed the instant lawsuit, and a causal connection may exist between the two. However, Gilbert fails to meet his burden of rebutting DMACC's legitimate,

-14-

nondiscriminatory reason for demoting Gilbert based on the extensive plagiarism contained in Gilbert's application and Gilbert's acts of misrepresentation during the investigation. To prove pretext, Gilbert must both discredit DMACC's asserted reason for the demotion and show the circumstances permit drawing a reasonable inference that the real reason for his demotion was retaliation. See Twymon v. Wells Fargo & Co., 462 F.3d 925, 935 (8th Cir. 2006). Gilbert satisfies neither requirement. Indeed, Gilbert admitted his application contained plagiarized materials. Gilbert's response during the investigation could generously be labeled not fully candid. Until DMACC began the investigation in response to Gilbert's lawsuit, DMACC was unaware of the nature and extent of Gilbert's plagiarism. Only one search committee member was suspicious of Gilbert's choice of language because of the use of a particular three-word phrase. This member was not Gilbert's supervisor, and there is no evidence the member reported his concern to DMACC officials during the search process.

Furthermore, DMACC's lack of an explicit policy regarding plagiarism by faculty members does not demonstrate DMACC's decision to investigate and discipline Gilbert for his actions was pretextual.[11] Gilbert fails to present any evidence the persons involved in the decision-making process ever had considered prior instances of plagiarism by a DMACC faculty or staff member. As Provost of the Urban Campus, Gilbert's duties included administering academic programs and enforcing DMACC's policies, including DMACC's prohibition against plagiarism by students. The reprehensibility of plagiarism in the field of higher education, particularly by one in a leadership position, erodes Gilbert's assertion that DMACC's

---

[11]Although DMACC does not have an official policy regarding plagiarism by faculty, staff, or administrative employees, it does have such a policy applicable to students. DMACC also has mission goals and value statements providing that the "college adheres to the highest standards of integrity and ethical behavior," which President Denson described as being the "closest written statement [DMACC has] that would indicate that plagiarism is not acceptable at any level."

actions were retaliatory in nature. DMACC has never wavered from its explanation for demoting Gilbert, which, as DMACC points out, militates against a finding of pretext. See EEOC v. Trans States Airlines, Inc., 462 F.3d 987, 995 (8th Cir. 2006) (noting the defendant employer never wavered from its one explanation for terminating the plaintiff, and distinguishing those cases in which the employers' substantial change in position supported an inference of pretext).

Summary judgment in DMACC's favor is proper on Gilbert's retaliation claim.

## III. CONCLUSION

For the foregoing reasons, we affirm the well-reasoned opinion and judgment of the district court.

_____