**Lixin LIU, Plaintiff,**

v.

**BASF CORPORATION and BASF Plant Science LLC d/b/a Exseed Genetics, Defendant.**

**No. 4:07–cv–00149–RAW.**

United States District Court,
S.D. Iowa,
Central Division.

March 16, 2009.

Michael J. Carroll, Babich Goldman Cashatt & Renzo PC, Des Moines, IA, for Plaintiff.

Kerrie M. Murphy, Gonzalez Saggio & Harlan LLP, West Des Moines, IA, for Defendant.

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ROSS A. WALTERS, United States Magistrate Judge.

Before the Court following hearing is defendants' motion for summary judgment [17]. Plaintiff Lixin Liu is of Chinese national origin. He was an employee of BASF Plant Sciences ("BPS") working under an H–1B visa sponsored by BPS. His employment was terminated in March 2006 when his eligibility to work in the United States was about to expire. Mr. Liu filed a Complaint on April 10, 2007 which, as amended, alleges the termination of his employment was a product of unlawful national origin discrimination in violation of Title VII of the Civil Rights Act of 1964 as amended ("Title VII"), 42 U.S.C. § 2000e, et seq., (Count I) and the Iowa Civil Rights Act (ICRA), Iowa Code Chapter 216 (Count II). The case was referred to the undersigned for all further proceedings pursuant to 28 U.S.C. § 636(c). In response to the present motion plaintiff con-

cedes summary judgment is appropriate on his claims against defendant BASF Corporation.[1]

## I.

### SUMMARY JUDGMENT

Defendants are entitled to summary judgment if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Buboltz v. Residential Advantages, Inc.*, 523 F.3d 864, 868 (8th Cir.2008)(quoting Fed.R.Civ.P. 56(c)); *see Hervey v. County of Koochiching*, 527 F.3d 711, 719 (8th Cir.2008). A genuine issue of material fact exists "if it has a real basis in the record." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir.1992)(citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A "genuine issue of fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The court must view the facts in the light most favorable to the nonmoving party, and give that party the benefit of all reasonable inferences which can be drawn from them. *See Carlson v. Roetzel & Andress*, 552 F.3d 648, 650 (8th Cir.2008); *Hervey*, 527 F.3d at 719; *EEOC v. Liberal R–II Sch. Dist.*, 314 F.3d 920, 922 (8th Cir.2002). Reasonable inferences are "those inferences that may be drawn without resorting to speculation." *Mathes v. Furniture Brands Int'l, Inc.*, 266 F.3d 884, 885–86 (8th Cir.2001) (citing *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1110 (8th Cir.2001)); *see Mat-*

---

1. BPS is a wholly-owned subsidiary of BASF Corporation.

*sushita*, 475 U.S. at 587, 106 S.Ct. 1348; *Riley v. Lance, Inc.*, 518 F.3d 996, 1001 (8th Cir.2008); *Erenberg v. Methodist Hosp.*, 357 F.3d 787, 791 (8th Cir.2004).

The moving party must first inform the court of the basis for the motion and identify the portions of the summary judgment record which the movant contends demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Robinson v. White County, Ark.*, 459 F.3d 900, 902 (8th Cir.2006). The nonmoving party must then "go beyond the pleadings and by affidavits, depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue of material fact." *Rouse v. Benson*, 193 F.3d 936, 939 (8th Cir.1999); *see Satcher v. University of Arkansas at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 734 (8th Cir.2009)(plaintiff must "show that there [are] genuine issues of material fact in the record"); *In re Patch*, 526 F.3d 1176, 1180 (8th Cir.2008); *Thomas v. Corwin*, 483 F.3d 516, 526–27 (8th Cir.2007); *Littrell v. City of Kansas City, Mo.*, 459 F.3d 918, 921 (8th Cir.2006).

Summary judgment should be approached with caution in employment discrimination cases because they are "inherently fact based." *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1118 (8th Cir.2006); *Simpson v. Des Moines Water Works*, 425 F.3d 538, 542 (8th Cir.2005)(quoting *Mayer v. Nextel West Corp.*, 318 F.3d 803, 806 (8th Cir.), *cert. denied*, 540 U.S. 823, 124 S.Ct. 153, 157 L.Ed.2d 43 (2003), quoting in turn *Keathley v. Ameritech Corp.*, 187 F.3d 915, 919 (8th Cir.1999)). However, "no separate summary judgment standard exists for discrimination ... cases and ... such cases are not immune from summary judgment." *Wallace*, 442 F.3d at 1118 (citing *Berg v. Norand Corp.*, 169 F.3d 1140, 1144 (8th Cir.1999)).

## II.

### FACTUAL BACKGROUND

Many of the underlying facts are not disputed. To the extent they are, the following summary presents them in the light most favorable to Mr. Liu.

BPS is involved in the research, development and marketing of agromic traits. (Def. App. at 6). Its headquarters is located at Research Triangle Park in North Carolina. (*Id.* at 26). It also has facilities in other parts of the United States. (*Id.* at 6). At the time Mr. Liu was employed by BPS, it had a research unit in Ames, Iowa which was involved in plant genetics research. (*Id.* at 10).

As noted, Mr. Liu is of Chinese national origin. (Amended Complaint ¶ 7).[2] In January 2003 BPS hired Mr. Liu to work as a Research Associate. (Def. App. at 10). Prior to receiving an offer of employment, Mr. Liu was interviewed by Dr. Peter Keeling, Dr. Hangping Guan and Suzy Cocciolone. (*Id.* at 13). Dr. Keeling was the Manager of Biotechnology and Unit Director of the Ames Research Unit. (*Id.* at 10). In December 2002 Dr. Keeling had recommended that BPS offer employment to Mr. Liu. (*Id.* at 11).

At the time he commenced employment with BPS, Mr. Liu held an F–1 student visa which permitted him to study in the United States. (Def. App. at 31). To work for BPS, Mr. Liu was required to obtain an H–1 visa, a temporary visa which would allow him to work in the United States. (*Id.* at 27). BPS sponsored Mr.

---

2. More specifically, during the time at issue Mr. Liu was a citizen of the People's Republic of China. (Def. App. at 32). He currently resides in Vancouver, British Columbia. (*Id.* at 12).

Liu's H–1 visa application. (*Id.* at 27). On April 24, 2003, Jonathon Sprowl, a BASF Human Resource Manager assigned to oversee all human resource matters for BPS, including immigration, executed an H–1 application for Mr. Liu. (*Id.* at 6). The application was approved·on May 5, 2003 and Mr. Liu was issued an H–1B visa.[3] (*Id.* at 32). The visa was valid from May 20, 2003 to May 20, 2006. (*Id.*)

Mr. Liu was considered a nonimmigrant "alien in a specialty occupation." (Def. Supp. App. at 1). As such he could work a total of six years in H–1B status after which, unless his status was changed, his work eligibility would expire. (Def. App. at 20). *See* 8 C.F.R. § 214.2(h)(13)(iii)(A). Though on an F–1 student visa at the time he was hired by BPS, Mr. Liu had previously expended some of his H–1B time working for other employers. (*Id.*)[4]

With the H–1B visa in hand permitting temporary employment, BPS, consistent with its prior filings on behalf of other employees performing comparable jobs, pursued an EB–3 permanent immigrant visa for Mr. Liu—a "green card." (Def. App. at 7). Again, BPS was Mr. Liu's sponsor. (*Id.*) For this purpose BPS employed the services of the Alan Gordon immigration law firm in North Carolina ("the Gordon law firm"). (Def. Supp. App. at 1; Pl. App. at 7). On January 21, 2004 Mr. Sprowl sent an e-mail to the Gordon law firm instructing the firm to start the green card application process for Mr. Liu. A few days later the firm sent a questionnaire to Mr. Liu. (Pl. App. at 8). Mr. Liu says he asked Mr. Sprowl if he could hire an attorney to handle his immigration paperwork but was told BASF did not allow employees to hire their own lawyers for the immigration process. (*Id.* at 7). Mr. Sprowl told Mr. Liu that BASF had a contract with the Gordon law firm to handle immigration issues and had been satisfied with the firm's services. (*Id.*)

The major tasks that must be completed as part of an application for an EB–3 permanent immigrant visa are (1) "labor recruitment," which involves internal and external advertising of the nonimmigrant's position with the company to determine if there are any qualified candidates who are United States citizens; (2) filing an Application for Alien Labor Certification (the "labor certification application"), with request for waiver/reduction in recruitment; (3) obtaining approval of the application; and (4) filing an I–485 petition for permanent residency (the green card). (Def. App. at 7). Timing is important. The labor certification application must be filed at least one year prior to expiration of a nonimmigrant's H–1B visa in order for the H–1B visa to be eligible for annual renewal during the time it takes to process the permanent visa application. (*Id.*)

Mr. Liu was dissatisfied with the pace with which his permanent residency was being pursued and what he says was the unresponsiveness of the Gordon law firm. He contacted Dr. Keeling about this and shortly afterward, in late April 2004, the Gordon law firm sent Mr. Liu a draft "Form ETA 750, Part B" ("the ETA form") to review with a request that he provide more detailed employment information, sign and return the form. (Pl. App. at 9; Def. Supp. App. at 16). The ETA form had to be filed with the labor certification application. Mr. Liu was told the law firm needed the additional employment information to begin drafting the recruitment advertisements. (Def. App. at 18; Def. Supp. App. at 16). Mr. Liu did as instructed. Apparently there was some continuing concern about the adequacy of

---

**3.** Both F–1 and H–1B are nonimmigrant classifications. 8 C.F.R. § 214.1(a).

**4.** *See* n. 9 *infra.*

Mr. Liu's job description. Mr. Liu drafted a tentative job description and on May 19, 2004 signed another ETA form and sent it to the Gordon law firm. (Pl. App. at 9; Def. Supp. App. at 18). Thereafter, until November 2004 Mr. Liu continued to make periodic inquiries of Mr. Sprowl and the Gordon law firm about the status of the recruitment process and when his labor certification application would be filed. (Pl. App. at 9–11).

The job information from Mr. Liu was used to frame the labor recruitment advertising. (*See* Def. Supp. App. at 34–35). The advertising did not get underway until November 2004. The labor recruitment process was completed by December 2004/January 2005. (*Id.*)

In November 2004 Mr. Liu learned that the U.S. Department of Labor was establishing two regional "backlog" centers in an effort to speed up labor certification processing. Under the existing state level processing system the backlog centers would replace, applications filed in less populous states like Iowa were acted on sooner than those filed in more populous states where long delays were experienced. (Pl. App. at 11–12; Def. Supp. App. at 24, 26). Under the new approach labor certification applications filed after January 1, 2005 would be sent to one of the backlog centers for processing. Mr. Liu was concerned putting his application in the hopper at a backlog center would lengthen the waiting time before his application would be acted on, and he expressed this fear to Mr. Sprowl. (Pl. App. at 13).

Apparently the backlog centers were part of a transition process to a new, computerized "PERM" system for labor certification processing. PERM was scheduled to go into effect and be mandatory after March 28, 2005. (Pl. App. at 13; Def. Supp. App. at 26, 28, 32). The system was intended to streamline labor certification processing, but, if it was to be used for Mr. Liu's application, would require the nearly completed labor recruitment process to be done over. (Def. App. at 34, 64; Def. Supp. App. at 28).

On January 12, 2005 Mr. Liu asked Mr. Sprowl whether BPS was going to file his labor certification application under the PERM system. (Pl. App. at 13). Mr. Sprowl responded he would seek advice on the best approach. (*Id.*) On February 7, 2005 Mr. Liu received a "corrected" ETA form from the Gordon law firm with instructions to date, sign, and return. (Def. Supp. App. at 27). The labor certification application with its summary of BPS's recruitment efforts (which had yielded no potential U.S. candidates) had been drafted and was ready to go. (Def. Supp. App. at 33–56).[5] Mr. Liu initially responded he would return the ETA form the next day (*id.*), but by then had had second thoughts. He called the Gordon law firm to clarify whether his labor certification application would be filed under the EB–2 preference category for "advanced degree professionals," which Mr. Liu thought would be quicker, or the EB–3 category for "professionals." He was told it would be filed under the latter.[6] (Pl. App. at 14; Def.

---

5. The application, which was to be submitted by BPS on behalf of Mr. Liu, was dated February 3, 2005 and signed by Mr. Sprowl on February 18, 2005. (Def. App. at 35).

6. Whether to file under the EB–2 or EB–3 preference category is based on the employer's minimum educational requirements for the position for which the labor certification is being sought, not the applicant's educational credentials. BPS's minimum educational requirements for the Associate Scientist position (to which Mr. Liu's job had been reclassified from Research Assistant) described in Mr. Liu's labor certification application was a bachelor degree. Thus, the EB–3 preference category was appropriate. (Def. Supp. App. at 2).

Supp. App. at 2). When he asked how long it would take before his labor certification application was acted on, Mr. Liu says he was told it might be as long as seven or eight years. (Pl. App. at 14).

The prospect of having to wait this long was particularly alarming to Mr. Liu. He sent an e-mail to Dr. Keeling and Mr. Sprowl on February 8, 2005 in which he expressed his disappointment at the lengthy delay he was facing which he attributed to the EB–3 category filing in combination with the plan to send his application in to be processed through a backlog center under the existing pre-PERM regulations. (Def. Supp. App. at 28). He had not seen his family in China for many years, his elderly father was frail, and family members had been asking him when he would get his green card and come back to visit. (*Id.*) Realizing the process would have to start over, he told Dr. Keeling and Mr. Sprowl he wanted to risk applying under the upcoming PERM system. (*Id.*) He asked for a conference with the Gordon law firm to discuss the option.

Mr. Sprowl responded by e-mail the next day:

> ... I realize your situation and we have had this with many other employees. One thing to be aware of is that the qualifications of the labor certification BS vs. MS is based on the position requirements, the Department of Labor requirements, and compensation data. They are not based on the individuals background. [sic] So given all this we chose the appropriate level for the position and the one we felt most confident in getting the labor certification approved.
> On the personal side, just because you don't have a greencard [sic] does not

mean you cannot travel. You can get travel authorizations (I–131) while waiting for your I–485. I will pursue this with Brian Golden,[7] this may help relieve some pressure for you.

> As far as the time difference between the EB2 and EB3 this has not been my experience. Our employees in the same situation have completed the process in 3 years or less. Additionally once your application is filed your H1B can be extended on an annual basis while your application is being processed.

(Def. Supp. App. at 29).

In response to Mr. Sprowl's e-mail, Mr. Liu asked about submitting an application for another job within the company. (Def. Supp. App. at 29). He saw changing jobs as a means to ensure his labor certification application would have to be started over under PERM. (Pl. App. at 15). Mr. Sprowl advised Mr. Liu his direct supervisor would have to be notified and give approval for interviewing, and said one issue to consider was how a job change would impact Mr. Liu's labor certification. (Def. Supp. App. at 30).

On March 2, 2005, the Gordon law firm contacted Mr. Sprowl by e-mail. Mr. Sprowl was advised the firm was ready to file Mr. Liu's labor certification application but needed his signed ETA form before it could do so. The firm was anxious to file the application before the new labor certification regulations (presumably those putting the PERM system in place) went into effect on March 28, 2005. (Def. Supp. App. at 31). Mr. Sprowl forwarded the e-mail to Mr. Liu with a request that Mr. Liu send the signed ETA form to the law firm ASAP. (*Id.* at 32).

---

7. Mr. Golden was a "Senior Supervising Paralegal" with the Gordon law firm and appears to have been the firm contact with respect to Mr. Liu's application. (Def. Supp. App. at 29).

On March 20, 2005 Mr. Liu e-mailed Dr. Keeling with his concerns about filing his labor certification application under the existing regulations. He again referred to the delay that would result from sending his application through one of the backlog centers and expressed concern U.S. immigration policy might change to his detriment in the interim. (Def. Supp. App. at 33). He "strongly proposed" switching to a PERM application when that system came into effect. Dr. Keeling e-mailed Mr. Sprowl the same day saying he was willing to support Mr. Liu's request if there were "no obvious downsides and it is cost-neutral." He asked Mr. Sprowl to solicit an opinion from Mr. Golden at the Gordon law firm concerning Mr. Liu's PERM proposal. (Def. Supp. App. at 34). Still on March 10, Mr. Liu e-mailed Mr. Sprowl noting Dr. Keeling's lack of objection and asking that his application be submitted under PERM with an EB–2 preference category. (Def. Supp. App. at 35). Mr. Sprowl responded by e-mail later that evening that the law firm advised against an EB–2 application because they thought the chances of success were minimal. (*Id.*)

On March 23, 2005 Mr. Liu asked the Gordon law firm for their reasons against submitting a PERM labor certification application. (Pl. App. at 17). The law firm's Mr. Golden responded the same day in an e-mail addressed to Mr. Liu:

BASF Plant Science has conducted recruitment under the current labor certification guidelines, and advised us that it received two candidates who were not minimally qualified. Therefore, Mr. Gordon is confident that the Department of Labor can approve labor certification under the current guidelines.

Mr. Gordon advises that the recruitment conducted thus far would not meet the new criteria as set forth in PERM. Therefore, new and additional recruitment would be required, incurring more costs for the company and increasing the risk that a minimally qualified U.S. worker will respond. If a minimally qualified worker responds to the recruitment, BASF cannot file the labor certification application for you.

For these reasons, Mr. Gordon recommends that you immediately return the signed applications (Form ETA 750 B) sent to you on February 3. We must receive the signed applications tomorrow, March 24 to proceed with the filing under the current RIR guidelines.

(Def. Supp. App. at 36).

Dr. Keeling also sent an e-mail to Mr. Liu on March 23, 2005:

I write to inform you of a [BPS] decision concerning the many discussions in which you have advocated that [BPS] change the current process being followed for your current Green Card Application. As you know, the existing process has been under the guidance of Mr. Golden and you recently passed the important step of labor certification. You have requested that the existing process be abandoned in favor of moving to the new PERM process. This has now been carefully considered from a legal as well as business perspective. I now write to inform you that [BPS] will continue with your existing application, but will not be willing to change the process of your Application. This is primarily because of the significant costs involved and the fact that these costs have already been incurred once by [BPS] as part of the existing process. In addition, as you know, the advice from Mr. Golden is not to move to PERM at this time.

It is my understanding that you have not yet signed the forms provided to you in order to proceed with the next step in the existing process. I write now to remind you that in order to secure this

next phase you must sign this today and send the form back to Mr. Goldens [sic] office today. It is my understanding that he is required to submit the response to the government officer tomorrow, Thursday March 24th, 2005. It is my further understanding that failure to do this on time would cause the collapse of the existing Application.

(Def. Supp. App. at 37).[8]

Mr. Liu decided not to sign and return the ETA form and has testified it was his decision whether or not to do so. (Def. App. at 16). As a result, the permanent immigrant visa application process was brought to a halt on March 24, 2005. (*Id.* at 8, 18).

According to Mr. Liu he unsuccessfully applied for more than a dozen other positions within BPS, three of which are specifically referred to in the record, as a business analyst, senior associate scientist, and a position under another job title which is not described. A promised interview for the analyst position did not materialize, the senior associate scientist position was canceled and reopened at a lower level, and Mr. Liu was told he did not meet the requirements for the last. (Pl. App. at 19–20; Def. Supp. App. at 38). All would have required a new labor certification application and recruitment process. (Def. Supp. App. at 38). Mr. Sprowl told Mr. Liu BPS would not agree to restart the labor certification process regardless of

the position he held. (*Id.*) Mr. Liu states that at some point after March 24, 2005 Dr. Keeling told him BPS would start the labor certification process again if Mr. Liu paid all of the costs, between $7,000 and $9,000, and used the Gordon law firm, to all of which Mr. Liu says he readily agreed. (Pl. App. at 18). Later, however, in June 2005, Dr. Keeling recanted, telling him BPS would not start the process again. (*Id.*)

Mr. Liu's employment with BPS was dependent on his continuing ability to work in the United States. (Def. App. at 8, 14). His H–1B status was scheduled to expire on May 20, 2006. (*Id.* at 8, 19, 32). Mr. Liu knew he would not be eligible for employment in the United States when his H–1B status expired. (*Id.* at 18).[9]

In the fall of 2005 BPS decided to consolidate its research department into one unit to be located at its North Carolina headquarters. (Def. App. at 8). In October 2005 BPS notified ten employees, including Mr. Liu, that their research positions at the Ames facility would be eliminated effective March 31, 2006. (*Id.*) BPS offered nine of the employees from the Ames facility positions in North Carolina. (*Id.*) Four of those employees were Asian, one a Korean with a green card, two American citizens of Chinese ancestry and one a Chinese citizen with a green card. (*Id.* at 8; Pl. App. at 21).

**8.** Mr. Liu states that in reply to Dr. Keeling's March 23 email he asked if he had to sign the ETA form and Dr. Keeling told him he did not have to. (Pl. App. at 18).

**9.** Mr. Liu has testified in his deposition that he first worked in H–1B status in December 1999 when he went to work for a seed company and later when he worked at Iowa State University. For a period of time between his university employment and employment for BPS he held the F–1 student visa. Mr. Liu thought he might have had some time left on the six-year H–1B clock beyond the May 20,

2006 termination date on the form from the government notifying him his BPS-sponsored H–1B application had been granted. (Def. App. at 20, 32). However, the record in this regard is very unclear. In any event, had Mr. Liu signed and returned the ETA form by the March 2005 deadline his labor certification application would have been filed more than a year prior to the expiration of his H–1B visa, making him eligible for one-year H–1B visa extensions during the time his permanent immigrant application was being processed. (*Id.* at 3).

On October 14, 2005 Dr. Keeling and Mr. Sprowl informed Mr. Liu it did not make good business sense for BPS to incur the expense of relocating him from Iowa to North Carolina because he would not be able to remain in the United States much longer after the relocation. (*Id.* at 20). They told him his employment would end on March 31, 2006. (*Id.* at 9).

Mr. Liu's last day of employment with BPS was March 8, 2006. (Pl. App. at 20–21).

### III.

### DISCUSSION

 Mr. Liu alleges the termination of his employment with BPS constituted national origin discrimination in violation of Title VII and ICRA.[10] Title VII makes it an unlawful employment practice for an employer to "discharge . . . any individual . . . because of such individual's . . . national origin." 42 U.S.C. § 2000e–2(a)(1). "National origin" is not synonymous with alienage or citizenship. "[N]othing in [Title VII] makes it illegal to discriminate on the basis of citizenship or alienage." *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 95, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973).[11] Rather, "national origin . . . refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came." *Id.* at 89, 94 S.Ct. 334. EEOC regulations state the concept of natural origin includes not only a person's place of origin but also those who have the "physical, cultural or linguistic characteristics of a national origin group." 29 C.F.R. § 1606.1. Mr. Liu's national origin is Chinese. A person whose national origin is Chinese may therefore be a Chinese national, a Chinese–American, or a person of Chinese ancestry or cultural identity who is a citizen of some other country. What Title VII prohibits in Mr. Liu's case is discrimination against him because of his Chinese ancestry.

 There is no direct evidence of discriminatory animus toward Mr. Liu because of his Chinese national origin. Accordingly, his claim must be analyzed under the familiar burden-shifting framework laid out *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas* a plaintiff must first establish a *prima facie* case. The evidentiary burden at the *prima facie* stage is "minimal." *Stewart v. Ind. Sch. Dist. No. 196*, 481 F.3d 1034, 1043 (8th Cir.2007)(quoting *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 881 (8th Cir.2005)). If a *prima facie* case is shown, the burden shifts to the employer to rebut the resulting presumption of illegal discrimination by articulating a legitimate non-discriminatory reason for the employment decision at issue. If the employer articulates such a reason, the burden shifts back to plaintiff to put forward evidence that the articulated reason is a "mere pretext" for discrimination. *Gilbert v. Des Moines Area Community Col-*

---

10. ICRA also prohibits discrimination in employment on the basis of national origin. Iowa Code § 216.6(1)(a). Iowa courts have analyzed claims under ICRA by applying the federal framework for Title VII cases. *Hannoon v. Fawn Eng'g Corp.*, 324 F.3d 1041, 1046 (8th Cir.2003) (citing *Iowa State Fairgrounds Sec. v. Iowa Civil Rights Comm'n*, 322 N.W.2d 293, 296 (Iowa 1982)); *Vivian v. Madison*, 601 N.W.2d 872, 873 (Iowa 1999). Accordingly, the Court has combined analysis of plaintiff's state and federal claims.

11. Discrimination on the basis of citizenship which has the purpose or effect of discriminating against a national origin group can violate Title VII. *See Espinoza*, 414 U.S. at 92–93, 94 S.Ct. 334; 29 C.F.R. § 1606.5(a). There is no evidence BPS discriminates against aliens in its employment practices, much less that any such practice has had the purpose or effect of discriminating against persons of Chinese national origin.

*lege,* 495 F.3d 906, 913–14 (8th Cir.2007); *Kobrin v. University of Minnesota,* 121 F.3d 408, 413–14 (8th Cir.1997), *cert. denied,* 522 U.S. 1113, 118 S.Ct. 1046, 140 L.Ed.2d 111 (1998). Because pretext evidence is reviewed in light of the employer's proffered legitimate reason for the employment action, more substantial evidence is required to show pretext than to make a *prima facie* case. *Willnerd v. First National Nebraska,* 558 F.3d 770, 778 (8th Cir.2009)(quoting *Logan,* 416 F.3d at 881); *Jones v. United Parcel Service, Inc.,* 461 F.3d 982, 992 (8th Cir.2006). The burden of persuasion remains with plaintiff throughout the analysis. *Gross v. FBL Financial Services, Inc.,* 526 F.3d 356, 359 (8th Cir.), *pet. for cert. granted,* —— U.S. ——, 129 S.Ct. 680, 172 L.Ed.2d 649 (2008); *Kobrin,* 121 F.3d at 414 (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

■ To establish a *prima facie* case of discrimination in a discharge case a plaintiff must show "(1) he is a member of a protected group; (2) he was meeting [his employer's] legitimate expectations; (3) he was discharged, and (4) the discharge occurred in circumstances that give rise to an inference of unlawful discrimination." *Riser v. Target Corp.,* 458 F.3d 817, 820 (8th Cir.2006), *cert. denied,* 549 U.S. 1253, 127 S.Ct. 1382, 167 L.Ed.2d 161 (2007)(citing *Cherry v. Ritenour Sch. Dist.,* 361 F.3d 474, 478 (8th Cir.2004)). The first three of these elements are satisfied. Mr. Liu is a member of a protected class, the Chinese national origin group, and he was discharged. BPS does not dispute that Mr. Liu was qualified for his position with BPS and was meeting expectations, but says he could not work and therefore would not have been qualified after the expiration of his H–1B visa. At the time Mr. Liu was discharged his H–1B visa allowed him to work, if not for long. The pending end of his H–1B authorization to work is more relevant to damages than to liability. The doubtful *prima facie* element is the fourth, causation element—the presence of circumstances which give rise to an inference of national origin discrimination.

■ Evidence that similarly situated employees who were not of Chinese national origin were treated differently than Mr. Liu would support an inference of discrimination. *Rodgers v. U.S. Bank, N.A.,* 417 F.3d 845, 850–51 (8th Cir.2005); *see Philip v. Ford Motor Co.,* 413 F.3d 766, 768 (8th Cir.2005); *Chavez v. City of Osceola,* 324 F.Supp.2d 986, 992 (S.D.Iowa 2004)(citing *Jacob–Mua v. Veneman,* 289 F.3d 517, 522 (8th Cir.2002)). Mr. Liu compares himself to the nine employees who were offered employment at BPS's North Carolina headquarters when the Ames facility closed. Three of the employees were of Chinese national origin (two Chinese–Americans and a Chinese national with a green card). Mr. Liu argues he was treated differently than his co-workers who did not require a work authorization, or had obtained such an authorization. This difference was merely a consequence of Mr. Liu's immigration status and serves only to illustrate he was not similarly situated to the retained employees. Comparison with the other employees does not create an inference of discrimination against Mr. Liu because of his Chinese national origin.

Some facts are in opposition to any inference of discrimination. Dr. Keeling was a decision maker in hiring Mr. Liu and firing him about three years later. Mr. Sprowl was responsible for obtaining Mr. Liu's H–1B visa so he could work for BPS. Mr. Sprowl appears to have also participated in the discharge decision. "There is a strong inference that discrimination was not a motivating factor if the same person hired and fired the plaintiff within a relatively short period of time." *Herr v. Air-*

borne Freight Corp., 130 F.3d 359, 362 (8th Cir.1997)(quoted in Arraleh v. County of Ramsey, 461 F.3d 967, 976 (8th Cir.2006), cert. denied, 550 U.S. 904, 127 S.Ct. 2100, 167 L.Ed.2d 813 (2007)). BPS had retained the Gordon law firm to pursue permanent immigrant status for Mr. Liu and had completed the labor recruitment part of the process necessary before Mr. Liu's labor certification application could be filed. This investment made so that Mr. Liu could continue in BPS's employment is inconsistent with any intent to discriminatorily discharge him because of his national origin. So also is the fact that BPS continued Mr. Liu's employment for nearly a year after he decided not to sign the ETA form, until nearly the end of his employment eligibility.

Mr. Liu argues BPS could have sought an extension of his existing H–1B status for thirteen months, BPS incorrectly believed his work authorization would expire in May 2006, and even if it had to expire then he could have been placed on unpaid leave until he could work again. The only record citation to the possibility of an extension of Mr. Liu's H–1B six-year time period is to Mr. Liu's deposition testimony that he thought he still had some eligibility beyond May 2006 but did not know how much. (Def. App. at 20). See n. 9, supra. "[U]nsupported, self-serving allegations" do not suffice, Smith v. Int'l Paper Co., 523 F.3d 845, 848 (8th Cir.2008) (quoting Bass v. SBC Commun., Inc., 418 F.3d 870, 872 (8th Cir.2005)), but even if Mr. Liu's H–1B status could have been extended for a period of time, there is no evidence BPS

was aware of that fact. The approval notice for Mr. Liu's H–1B status stated it was valid to May 20, 2006 and the record indicates that is what Mr. Liu and BPS were acting on. (Id. at 32). Mr. Liu did not ask BPS to seek an extension of his H–1B visa, nor did he request unpaid leave as an option.

Mr. Liu contends BPS's decision not to restart his green card application process under the PERM regulations, or allow him to do so at his own expense, "only affected [him] because of his national origin [and] he was treated differently than his similarly situated American co-workers." (Pl. Brief at 7). BPS was not required to accede to Mr. Liu's request that his permanent status application be started over under PERM. BPS had made an effort and incurred the expense of preparing an application under the existing regulations. All that was needed was Mr. Liu's signature on the ETA form.[12] BPS's decision not to begin again was a business decision it had a right to make and which in the circumstances here does not support an inference of national origin discrimination. Adams v. O'Reilly Automotive, Inc., 538 F.3d 926, 930 (8th Cir.2008) ("Federal courts ... are not in the business of micromanaging or second-guessing companies'" decisions)(citing Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 781 (8th Cir. 1995) and Baldwin v. Blue Cross/Blue Shield of Ala., 480 F.3d 1287, 1303–04 (11th Cir.2007), cert. denied, —— U.S. ——, 128 S.Ct. 499, 169 L.Ed.2d 341 (2007)); see Arraleh, 461 F.3d at 976. Moreover, the

12. In responding to BPS's statement of facts and in his brief Mr. Liu a number of times mentions that he had already signed an ETA form in the spring of 2004, implicitly suggesting it was not necessary for him to sign the ETA form sent to him by the Gordon law firm in February 2005. BPS's assertion that the earlier form was a draft and could not have been used because it was not current at the time the labor certification application was ready for filing is not contradicted in the record. (See Def. Supp. App. at 2–3). Moreover, in view of Mr. Liu's refusal to sign the final version of the form and objections to the labor certification application prepared by the Gordon law firm, he could not have expected BPS to attach the earlier version of the ETA form and send the application in.

argument here conflates national origin and alienage. Mr. Liu's problem was his immigration status, not his Chinese ancestry.

Notwithstanding the minimal showing required, the Court concludes Mr. Liu's discharge did not occur in circumstances which give rise to an inference of national origin discrimination and, accordingly, he has not established a *prima facie* case.

 The legitimate reason given for Mr. Liu's discharge is that his H–1B visa was about to expire, the Ames facility was closing, and it did not make sense to offer Mr. Liu employment in North Carolina as BPS did with his co-workers. It follows from the foregoing discussion that if the analysis passes beyond the *prima facie* stage, Mr. Liu has not produced the more substantial evidence required to demonstrate that BPS's explanation was a pretext for national origin discrimination.

Mr. Liu argues again that the discharge decision "was based on faulty information and a misunderstanding of the American immigration process," because his visa could have been renewed for about another year. (Pl. Brief at 8). As noted before, this argument is not factually supported. Even if BPS was misinformed about Mr. Liu's eligibility to extend his H–1B visa, there is no basis to conclude otherwise than that BPS honestly believed Mr. Liu was about to lose his ability to work for BPS.

Mr. Liu complains that the labor recruitment phase dragged on too long, and by the time it was completed his labor certification application was, as a part of the transition to the PERM system, destined for a backlog center, increasing the delay before his application would be finally acted on. When the possibility of expediting his application through the new PERM system presented itself BPS declined to restart the process to take advantage of the opportunity. Through Dr. Keeling BPS went back and forth on whether it would pursue the PERM alternative, or allow Mr. Liu to fund the effort, and before long it was too late to do anything. As Mr. Liu sees it, BPS's mishandling of the green card application process set him up for termination.

It did take many months before the labor recruitment process was completed. As a result Mr. Liu's labor certification application was not ready until near the point where the regulations were about to be changed. It was reasonable for Mr. Liu to think the planned filing under the regulations which were about to sunset would lengthen the process overall. His desire, as he put it, to "take the risk and give [PERM] a try" was understandable. (Def. Supp. App. at 28). For a number of reasons, however, none of this is probative of pretext for national origin discrimination. First, the Gordon law firm largely had control of the pace of the process. There is no suggestion the firm harbored a discriminatory motive. Second, BPS was following the Gordon law firm's advice. The firm's advice that the labor certification application it had prepared for Mr. Liu be filed before the new PERM regulations came into effect has not been discredited. Finally, the fact remains Mr. Liu's labor certification application was ready to be filed in February 2005, lacked only his execution of the ETA form, and if the application had been filed he could have continued to work for BPS until it was acted upon. The dispute between Mr. Liu and BPS concerning under which regulations his green card application would proceed was a dispute about process, not purpose. The purpose shared by both Mr. Liu and BPS was expressed in the labor certification application signed by Mr. Sprowl—to allow Mr. Liu to work for BPS "on an indefinite basis." (Def. App. at 35).

Finally, as evidence of animosity toward him, Mr. Liu points to his unsuccessful efforts to obtain different employment within BPS or BASF to force a shift to a PERM application, and his 2004 performance review and salary increase which he thought did not adequately reflect his services to the company. (Pl. App. at 20). There is little in the record about the other jobs Mr. Liu attempted to obtain beyond the fact he applied for them, did not receive them and he felt he was qualified. That Mr. Liu felt shortchanged by his 2004 performance review is not significant because BPS has never contended his performance was inadequate. This evidence is also insubstantial on the issue of pretext.

Mr. Liu has not met his burden of discrediting BPS's stated reasons for discharging him nor do any of the circumstances on which he relies raise a reasonable inference that the real reason for his discharge was his Chinese national origin. Overall, the evidence produced by Mr. Liu is insufficient to permit the jury to reasonably conclude Mr. Liu's Chinese national origin was a motivating factor in the decision to discharge him.

## IV.

## RULING AND ORDER

Defendants' motion for summary judgment [17] is **granted.** The Clerk shall enter judgment dismissing the Complaint.

IT IS SO ORDERED.